# LEMON ET AL. *v.* KURTZMAN, SUPERINTENDENT OF PUBLIC INSTRUCTION OF PENNSYLVANIA, ET AL.

No. 71–1470.  Argued November 8, 1972—Decided April 2, 1973

Mr. Justice White concurred in the judgment.

Burger, C. J., announced the judgment of the Court and an opinion in which Blackmun, Powell, and Rehnquist, JJ., joined. White, J., concurred in the judgment. Douglas, J., filed a dissenting opinion, in which Brennan and Stewart, JJ., joined, *post*, p. 209. Marshall, J., took no part in the consideration or decision of the case.

*David P. Bruton* argued the cause for appellants. With him on the briefs were *Melvin L. Wulf, Sanford J. Rosen,* and *Franklin C. Salisbury.*

*William B. Ball* argued the cause for appellees. With him on the brief for appellee Commonwealth of Pennsylvania were *J. Shane Creamer,* Attorney General, *Samuel Rappaport, Joseph G. Skelly, James E. Gallagher, Jr., C. Clark Hodgson, Jr.,* and *William D. Valente. Henry T. Reath* filed a brief for appellee Pennsylvania Association of Independent Schools.

Mr. Chief Justice Burger announced the judgment of the Court and an opinion in which Mr. Justice Blackmun, Mr. Justice Powell, and Mr. Justice Rehnquist join.

On June 28, 1971, we held that the Pennsylvania statutory program to reimburse nonpublic sectarian schools for certain secular educational services violated the Establishment Clause of the First Amendment. The case was remanded to the three-judge District Court for further

proceedings consistent with our opinion. *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971) (*Lemon I*). On remand, the District Court entered summary judgment in favor of appellants and enjoined payment, under Act 109, of any state funds to nonpublic sectarian schools for educational services performed after June 28, 1971. The District Court's order permitted the State to reimburse non-public sectarian schools for services provided before our decision in *Lemon I*. Appellants made no claim that appellees refund all sums paid under the Pennsylvania statute [1] struck down in *Lemon I*.

Appellants, the successful plaintiffs of *Lemon I*, now challenge the limited scope of the District Court's injunction. Specifically, they assert that the District Court erred in refusing to enjoin payment of some $24 million set aside by Pennsylvania to compensate nonpublic sectarian schools for educational services rendered by them during the 1970–1971 school year. We noted probable jurisdiction, 406 U. S. 943 (1972), and we affirm the judgment of the District Court.

(1)

The specifics of the Pennsylvania statutory scheme held unconstitutional in *Lemon I* need be recalled only briefly. Under Act 109, the participating nonpublic schools of Pennsylvania were to be reimbursed by the State for certain educational services provided by the schools pursuant to purchase-of-service contracts with the State. According to the terms of the contracts, the schools were to provide teachers, textbooks, and instructional materials for mathematics, modern foreign language, physical science, and physical education courses— "secular" courses of instruction. The State was not only to compensate the schools for the services provided, but

---

[1] Nonpublic Elementary and Secondary Education Act, June 19, 1968, No. 109, Pa. Stat. Ann., Tit. 24, §§ 5601–5609 (Supp. 1971).

also to undertake continuing surveillance of the instructional programs to insure that the services purchased were not provided in connection with "any subject matter expressing religious teaching, or the morals or forms of worship of any sect." See *Lemon I, supra,* at 609–610.

Under § 5607 of the Act, any nonpublic school seeking reimbursement was to "maintain such accounting procedures, including maintenance of separate funds and accounts pertaining to the cost of secular educational service, as to establish that it actually expended in support of such service an amount of money equal to the amount of money sought in reimbursement." To this end, the school accounts were to be subject to audit by the State Auditor General. Actual payment was to be made by the Superintendent of Public Instruction "in four equal installments payable on the first day of September, December, March and June of the school term *following* the school term in which the secular educational service was rendered." (Emphasis supplied.)

In *Lemon I,* we held that, although Act 109 had a secular legislative purpose, the Act fostered "excessive entanglement" of church schools and State through the requirement of ongoing state scrutiny of the educational programs of sectarian schools, the statutory post-audit procedures, and potential involvement in the political process. We found it unnecessary to decide whether Act 109 was constitutionally infirm on the additional ground that the "primary effect" of any state payments to church-related schools would be to promote the cause of religion in contravention of the Establishment Clause of the First Amendment.

(2)

Against this backdrop, we turn to the events relevant to this appeal. On June 19, 1968, Act 109 became law. Approximately one month later, appellants publicly declared their intention of challenging the constitution-

ality of the new legislation. During the following six months, the State took steps to implement the Act, promulgating regulations and, in January 1969, entering for the first time into service contracts for the 1968–1969 school year (then in progress) with approximately 1,181 nonpublic schools throughout Pennsylvania. The schools submitted schedules in June 1969, at the conclusion of the 1968–1969 school year, specifying the precise items of expense during that year for which they would seek reimbursement, to be made during the 1969–1970 school year. On June 3, 1969, appellants filed their complaint, asking that Act 109 be declared unconstitutional and its enforcement enjoined.

Simultaneously with their 1969 complaint, appellants filed a motion for a preliminary injunction to restrain the responsible state officials from "paying or processing for paying any funds pursuant to [Act 109]." However, appellants abandoned the request for preliminary relief in a letter of August 28, 1969, from their counsel to Judge Troutman. Appellants, describing their position as a "sensible recognition of the practical realities of the situation, . . . withdrew from any attempt to prevent initial payment to the nonpublic schools scheduled for September 2 [1969]." In the same letter, appellants' counsel mentioned the payments scheduled for December 2, 1969, but in fact no attempt was ever made to enjoin those reimbursements.

On November 29, 1969, a divided District Court granted appellees' motion to dismiss appellants' complaint for failure to state a claim on which relief could be granted. Appellants filed a notice of appeal to this Court on December 17, 1969; at no time before or after probable jurisdiction was noted on April 20, 1970, did appellants move for interlocutory relief pending appeal, even though on January 15, 1970, the schools entered into service contracts with the State for the 1969–1970 school year.

Consequently, the District Court had no occasion to consider the exercise of injunctive power *pendente lite.*

In September 1970, the schools began performing services for the 1970–1971 school year, compensable under the terms of Act 109; and on January 15, 1971, contracts were entered into for that school year.   On June 28, 1971, we held Act 109 unconstitutional and remanded the cause to the District Court for further proceedings consistent with our opinion.   Not until appellants filed their motion for summary judgment, in August 1971, did they first indicate their intention to prevent reimbursement under Act 109 for the services already provided by the schools during the 1970–1971 school year.

### (3)

Claims that a particular holding of the Court should be applied retroactively have been pressed on us frequently in recent years.   Most often, we have been called upon to decide whether a decision defining new constitutional rights of a defendant in a criminal case should be applied to convictions of others that predated the new constitutional development. *E. g., Robinson* v. *Neil,* 409 U. S. 505 (1973); *Adams* v. *Illinois,* 405 U. S. 278 (1972); *Desist* v. *United States,* 394 U. S. 244 (1969); *Stovall* v. *Denno,* 388 U. S. 293 (1967); *Johnson* v. *New Jersey,* 384 U. S. 719 (1966); *Tehan* v. *Shott,* 382 U. S. 406 (1966); *Linkletter* v. *Walker,* 381 U. S. 618 (1965). But "in the last few decades, we have recognized the doctrine of nonretroactivity outside the criminal area many times, in both constitutional and nonconstitutional cases." *Chevron Oil Co.* v. *Huson,* 404 U. S. 97, 106 (1971); *Hanover Shoe* v. *United Shoe Machinery Corp.,* 392 U. S. 481 (1968); *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964); *England* v. *State Board of Medical Examiners,* 375 U. S. 411 (1964).   We have approved nonretroactive relief in civil litigation, relating, for ex-

ample, to the validity of municipal financing founded
upon electoral procedures later declared unconstitutional,
*Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), and
*City of Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970);
or to the validity of elections for local officials held under
possibly discriminatory voting laws, *Allen* v. *State Board
of Elections,* 393 U. S. 544 (1969). In each of these cases,
the common request was that we should reach back to dis-
turb or to attach legal consequence to patterns of con-
duct premised either on unlawful statutes or on a differ-
ent understanding of the controlling judge-made law from
the rule that ultimately prevailed.

Appellants urge, as they did in the District Court, a
strange amalgam of flexibility and absolutism. Appel-
lants assure us that they do not seek to require the schools
to disgorge prior payments received under Act 109; in
the same breath, appellants insist that the presently dis-
puted payment be enjoined because an unconstitutional
statute "confers no rights; it imposes no duties; it affords
no protection; it creates no office; it is, in legal con-
templation, as inoperative as though it had never been
passed." *Norton* v. *Shelby County,* 118 U. S. 425, 442
(1886). Conceding that we have receded from *Norton*
in a host of criminal decisions and in other recent consti-
tutional decisions relating to municipal bonds, appellants
nevertheless view those precedents as departures from the
established norm of *Norton.* We disagree.

The process of reconciling the constitutional interests
reflected in a new rule of law with reliance interests
founded upon the old is "among the most difficult of
those which have engaged the attention of courts, state
and federal . . . ." *Chicot County Drainage Dist.* v.
*Baxter State Bank,* 308 U. S. 371, 374 (1940). Conse-
quently, our holdings in recent years have emphasized
that the effect of a given constitutional ruling on prior
conduct "is subject to no set 'principle of absolute retro-

active invalidity' but depends upon a consideration of 'particular relations . . . and particular conduct . . . of rights claimed to have become vested, of status, of prior determinations deemed to have finality'; and 'of public policy in the light of the nature both of the statute and of its previous application.'" *Linkletter, supra,* at 627, quoting from *Chicot County Drainage Dist., supra,* at 374. However appealing the logic of *Norton* may have been in the abstract, its abandonment reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. Appellants offer no persuasive reason for confining the modern approach to those constitutional cases involving criminal procedure or municipal bonds, and we ourselves perceive none.

In *Linkletter,* the Court suggested a test, often repeated since, embodying the recent balancing approach; we looked to "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Id.,* at 629. Those guidelines are helpful, see *infra,* at 201–203, but the problem of *Linkletter* and its progeny is not precisely the same as that now before us. Here, we are not considering whether we will apply a new constitutional rule of criminal law in reviewing judgments of conviction obtained under a prior standard; the problem of the instant case is essentially one relating to the appropriate scope of federal equitable remedies, a problem arising from enforcement of a state statute during the period before it had been declared unconstitutional. True, the temporal scope of the injunction has brought the parties back to this Court, and their dispute calls into play values not unlike those underlying *Linkletter* and its progeny. But however we state the issue, the fact remains that we are asked to re-

examine the District Court's evaluation of the proper means of implementing an equitable decree. Cf. *United States* v. *Estate of Donnelly*, 397 U. S. 286, 295 (1970); *id.*, at 296–297 (Harlan, J., concurring).

In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow. *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 15, 27 n. 10 (1971). Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary,[2] what is fair, and what is workable. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown* v. *Board of Education*, 349 U. S. 294, 300 (1955). MR. JUSTICE DOUGLAS, speaking for the Court, has said,

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made

---

[2] In *Linkletter* v. *Walker*, 381 U. S. 618, 629 (1965), the Court recalled Mr. Justice Cardozo's statement that "the federal constitution has no voice upon the subject," citing *Great Northern R. Co.* v. *Sunburst Oil & Refining Co.*, 287 U. S. 358, 364 (1932). In *Sunburst*, the Court refused to accept the petitioner's contention that "[a]dherence to precedent as establishing a governing rule for the past in respect of the meaning of a statute is . . . a denial of due process when coupled with the declaration of an intention to refuse to adhere to it in adjudicating any controversies growing out of the transactions of the future." *Id.*, at 363–364. Instead, the Court held that

"A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward." *Id.*, at 364.

*Sunburst* does not, of course, suggest that we may ignore constitutional interests in deciding whether to attach retrospective effect to a constitutional decision of this Court.

equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co.* v. *Bowles,* 321 U. S. 321, 329–330 (1944).

See also *Holmberg* v. *Armbrecht,* 327 U. S. 392, 396 (1946).

In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots.

(4)

The constitutional fulcrum of *Lemon I* was the excessive entanglement of church and state fostered by Act 109. We found it unnecessary to decide whether the "legislative precautions [of Act 109] restrict the principal or primary effect of the programs to the point where they do not offend the Religion Clauses." 403 U. S., at 613–614. For, as we said of both Act 109 and the similar Rhode Island provision, "[a] comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these restrictions are obeyed . . . . These prophylactic contacts will involve excessive and enduring entanglement between state and church." *Id.,* at 619. We further emphasized the reciprocal threat to First Amendment interests from enmeshing the divisive issue of direct aid to religious schools in the traditional political processes. *Id.,* at 622–624.

The sensitive values of the Religion Clauses do not readily lend themselves to quantification but, despite the inescapable imprecision, we think it clear that the proposed distribution of state funds to Pennsylvania's nonpublic sectarian schools will not substantially undermine the constitutional interests at stake in *Lemon I.* Act 109 required the Superintendent of Public Instruction to en-

sure that educational services to be reimbursed by the State were kept free of religious influences. Under the Act, the Superintendent's supervisory task was to have been completed long ago, during the 1970–1971 school year itself; nothing in the record suggests that the Superintendent did not faithfully execute his duties according to law. Hence, payment of the present disputed sums will compel no further state oversight of the instructional processes of sectarian schools. By the same token, since the constitutionality of Act 109 is now settled, there is no further potential for divisive political conflict among the citizens and legislators of Pennsylvania over the desirability or degree of direct state aid to sectarian schools under Act 109.

Two problems having constitutional overtones remain, but their resolution requires no compromise of the basic principles of *Lemon I*. There is, first, the impact of the single and final post-audit. The record indicates that the post-audit process will involve only a ministerial "cleanup" function, that of balancing expenditures and receipts in the closing accounting—undertaken only once, and in that setting a minimal contact of the State with the affairs of the schools. Second, there is the question of impinging on the Religion Clauses from the fact of *any* payment that provides any state assistance or aid to sectarian schools—the issue we did not reach in *Lemon I*. Yet even assuming a cognizable constitutional interest in barring any state payments, under the District Court holding that interest is implicated only once under special circumstances that will not recur. There is no present risk of significant intrusive administrative entanglement, since only a final post-audit remains and detailed state surveillance of the schools is a thing of the past. At the same time, that very process of oversight—now an accomplished fact—assures that state funds will not be applied for any sectarian pur-

poses.[3]   Finally, as will appear, even this single proposed payment for services long since passing state scrutiny reflects no more than the schools' reliance on promised payment for expenses incurred by them prior to June 28, 1971.

Offsetting the remote possibility of constitutional harm from allowing the State to keep its bargain are the expenses incurred by the schools in reliance on the state statute inviting the contracts made and authorizing reimbursement for past services performed by the schools.[4] It is well established that reliance interests weigh heavily in the shaping of an appropriate equitable remedy. *City of Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970); *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969); *Allen* v. *State Board of Elections,* 393 U. S. 544 (1969).   That

---

[3] See *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971):

"If the government closed its eyes to the manner in which these grants are actually used it would be allowing public funds to promote sectarian education.   If it did not close its eyes but undertook the surveillance needed, it would, I fear, intermeddle in parochial affairs in a way that would breed only rancor and dissension." *Id.,* at 640 (DOUGLAS, J., concurring).

"The Court thus creates an insoluble paradox for the State and the parochial schools.   The State cannot finance secular instruction if it permits religion to be taught in the same classroom; but if it exacts a promise that religion not be so taught . . . and enforces it, it is then entangled in the 'no entanglement' aspect of the Court's Establishment Clause jurisprudence." *Id.,* at 668 (opinion of WHITE, J.).

Here, the "insoluble paradox" is avoided because the entangling supervision prerequisite to state aid has already been accomplished and need not enter into our present evaluation of the constitutional interests at stake in the proposed payment.

[4] We agree with the District Court that whether the payments in question constitute payments under valid contracts or a subsidy "makes no difference in our decision."   To characterize the payments as subsidies does not "lessen the reliance of the nonpublic schools on the payments or the subsequent hardship upon them if the payments are not made."   348 F. Supp. 300, 304 n. 6.

there was such reliance by the schools is reflected by a well-supported District Court finding. The District Court found that there was no dispute "that to deny the church-related schools any reimbursement for their services rendered would impose upon them a substantial burden which would be difficult for them to meet." [5] 348 F. Supp. 300, 304–305.

The significance of appellee schools' reliance is reinforced by the fact that appellants' tactical choice not to press for interim injunctive suspension of payments or contracts during the pendency of the *Lemon I* litigation may well have encouraged the appellee schools to incur detriments in reliance upon reimbursement by the State under Act 109. In June 1969, appellants initiated the litigation that culminated in *Lemon I*. Though initially appellants moved for a preliminary injunction to block the September 1969 payment of funds for services rendered during the 1968–1969 school year, for reasons of their own appellants withdrew the request. Funds were paid in September and December 1969, and in March and June 1970. In 1970, the State en-

---

[5] The District Court's comment, in turn, reflects the following colloquy between that court and counsel for appellants, at the December 15, 1971, hearing after remand from this Court:

"MR. SAWYER: I am perfectly willing to concede—and I think I must here; we have taken no evidence—that there was reliance. And I would like to state, so there is no question about that, that I am assuming there was reliance. I think as a practical matter, however, the schools continued to do what they were doing before.

"JUDGE HASTIE: Reliance in the sense, I assume, of determining activities and expenditures in anticipation that this amount would be reimbursed?

"MR. SAWYER: I know of a school that escrowed it, but I would think that would be rare. And I have to live with that, I think, unless I want to be prepared to go ahead and ask to take testimony and try to prove that wasn't so. . . ."

tered into new contracts with the nonpublic schools; appellants took no steps to block the making of these contracts or to prevent the State from disbursing funds, in September and December 1970, or March and June 1971, for services rendered during the 1969–1970 school year. Appellants, meanwhile, had filed a notice of appeal to this Court by the time the distribution of funds for the 1969–1970 school year began. It was only after our decision in *Lemon I*—six months after the contracts for the 1970–1971 school year were perfected and after all services under those contracts had been performed—that appellants asserted their intention to block the payments due, beginning in the fall of 1971. Thus, for nearly two years, the State and the schools proceeded to act on the assumption that appellants would continue to adhere to a "sensible recognition of the practical realities of the situation."

There has been no demonstration by the appellee schools of the precise amount of any detriment incurred by them during the 1970–1971 school year in the expectation of reimbursement by the State. The complexity of such a determination for each of Pennsylvania's 1,181 nonpublic schools that contracted with the State under Act 109 is readily apparent.[6] But we need not

---

[6] As to each school, the determination of actual reliance would be subtle, premised largely on credibility and not on facts of record. Nonreliance could not be assumed simply because expenditure levels remained constant before and after Act 109; any school might well assert that it would have reduced its educational expenditures in some particular but for the expectation of compensation for certain other expenditures incurred in connection with Act 109. Similarly, the inquiry could not be limited to expenditures for those items specified by the Act. Increased expenditures for any of the gamut of a school's activities might have been incurred in reliance on reimbursement for services covered by Act 109.

dwell on the matter of uncertainty. On this record the District Court could reasonably find reliance on the part of the appellee schools and reasonably could conclude that no more was needed to demonstrate retrospectively the degree of their reliance.

It is argued, though, that the schools were foolhardy to rely on any reimbursement by the State whatever, in view of the constitutional cloud over the Pennsylvania program from the outset. We conclude, however, that our holding in *Lemon I* "decid[ed] an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil Co.* v. *Huson,* 404 U. S., at 106. A three-judge district court, with one dissent, upheld Act 109. Soon after, another three-judge district court in Rhode Island held unconstitutional the Rhode Island statutory scheme we considered together with Pennsylvania's program in *Lemon I.* Nor were district courts alone in disagreement over the constitutionality of *Lemon*-style plans to provide financial assistance to sectarian schools. This Court was itself divided when the issue was ultimately resolved after full briefing and argument. And the Court acknowledged "that we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law." *Lemon I,* 403 U. S., at 612.[7]

---

[7] According to the dissent, appellees can "tender no considerations of equity" because they had "clear warning" that they were "treading on unconstitutional ground." The apparent premise for this assertion is the view that the Establishment Clause forbids any and all use of tax moneys to "support" or to "subsidize" sectarian schools. Yet the Court's decisions, prior to and at the time of *Lemon I,* shied away from this sweeping application of the Establishment Clause, favoring instead particularized analysis of state involvement in religious schools, with the analysis based upon the facts and circumstances before us. *Tilton* v. *Richardson,* 403 U. S. 672 (1971);

That there would be constitutional attack on Act 109 was plain from the outset. But this is not a case where it could be said that appellees acted in bad faith or that they relied on a plainly unlawful statute. In this case, even the clarity of hindsight is not persuasive that the constitutional resolution of *Lemon I* could be predicted with assurance sufficient to undermine appellees' reliance on Act 109.

(5)

In the end, then, appellants' position comes down to this: that any reliance whatever by the schools was unjustified because Act 109 was an "untested" state statute whose validity had never been authoritatively determined. The short answer to this argument is that governments must act if they are to fulfill their high responsibilities. As one scholar has observed, the diverse state governments were preserved by the Framers "as separate sources of authority and organs of administration—a point on which they hardly had a choice." H. Wechsler, Principles, Politics, and Fundamental Law 50 (1961).

Appellants ask, in effect, that we hold those charged with executing state legislative directives to the peril of having their arrangements unraveled if they act before there has been an authoritative judicial determination that the governing legislation is constitutional. Appellants would have state officials stay their hands until newly enacted state programs are "ratified" by the federal courts, or risk draconian, retrospective decrees should the legislation fall. In our view, appellants' position

---

*Walz* v. *Tax Comm'n,* 397 U. S. 664, 669 (1970); *Board of Education* v. *Allen,* 392 U. S. 236, 242–243 (1968); *Everson* v. *Board of Education,* 330 U. S. 1, 14 (1947). There is, then, no basis for the dissent's suggestion that the Court has been "unequivocal" in proscribing all state assistance to religious schools.

could seriously undermine the initiative of state legislators and executive officials alike. Until judges say otherwise, state officers—the officers of Pennsylvania—have the power to carry forward the directives of the state legislature. Those officials may, in some circumstances, elect to defer acting until an authoritative judicial pronouncement has been secured; but particularly when there are no fixed and clear constitutional precedents, the choice is essentially one of political discretion and one this Court has never conceived as an incident of judicial review. We do not engage lightly in post hoc evaluation of such political judgment, founded as it is on "one of the first principles of constitutional adjudication—the basic presumption of the constitutional validity of a duly enacted state or federal law." *San Antonio School District* v. *Rodriguez, ante,* p. 1, at 60 (1973) (STEWART, J., concurring).

Federalism suggests that federal court intervention in state judicial processes be appropriately confined. See *Younger* v. *Harris,* 401 U. S. 37 (1971), and companion cases. Likewise, federalism requires that federal injunctions unrelated to state courts be shaped with concern and care for the responsibilities of the executive and legislative branches of state governments.[8] In short, the propriety of the relief afforded appellants by the District Court, applying familiar equitable principles, must be measured against the totality of circumstances and in light of the general principle that, absent contrary direc-

---

[8] This is not to say, of course, that the flexible range of federal injunctive powers should be curtailed so as to permit state officers to proceed with their business regardless of serious constitutional questions concerning state legislation. Indeed, a significant purpose of these tools is to preserve rights of all parties and to minimize unnecessary harm during the often protracted pendency of constitutional litigation.

tion, state officials and those with whom they deal are entitled to rely on a presumptively valid state statute, enacted in good faith and by no means plainly unlawful.

*Affirmed.*

Mr. Justice White concurs in the judgment.

Mr. Justice Marshall took no part in the consideration or decision of this case.

Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Stewart concur, dissenting.

There is as much a violation of the Establishment Clause of the First Amendment whether the payment from public funds to sectarian schools involves last year, the current year, or next year. Madison in his Remonstrance stated: "[T]he same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment . . . ." [1]

Whether the grant is for teaching last year or at the present time, taxpayers are forced to contribute to sectarian schools a part of their tax dollars.

The ban on that practice is not new. *Lemon I,* 403 U. S. 602, did not announce a change in the law. We had announced over and over again that the use of taxpayers' money to support parochial schools violates the First Amendment, made applicable to the States by virtue of the Fourteenth.

We said in unequivocal words in *Everson* v. *Board of Education,* 330 U. S. 1, 16: "No tax in any amount,

---

[1] Memorial and Remonstrance Against Religious Assessments, 2 Writings of James Madison 183, 186 (G. Hunt ed. 1901). The Remonstrance is reprinted in *Everson* v. *Board of Education,* 330 U. S. 1, 63 (Rutledge, J., dissenting), and in *Walz* v. *Tax Comm'n,* 397 U. S. 664, 719 (Douglas, J., dissenting).

large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." We reiterated the same idea in *Zorach* v. *Clauson,* 343 U. S. 306, 314, in *McGowan* v. *Maryland,* 366 U. S. 420, 443, and in *Torcaso* v. *Watkins,* 367 U. S. 488, 493. We repeated the same idea in *McCollum* v. *Board of Education,* 333 U. S. 203, 210, and added that a State's tax-supported public schools could not be used "for the dissemination of religious doctrines" nor could a State provide the church "pupils for their religious classes through use of the State's compulsory public school machinery." *Id.,* at 212.

MR. JUSTICE BRENNAN in his separate opinion in *Lemon I* put the matter succinctly when he said,

> "[F]or more than a century, the consensus, enforced by legislatures and courts with substantial consistency, has been that public subsidy of sectarian schools constitutes an impermissible involvement of secular with religious institutions." 403 U. S. 642, 648–649.

So there was clear warning that those who proposed such subsidies were treading on unconstitutional ground. They can tender no considerations of equity that should allow them to profit from their unconstitutional venture.

The issues presented in this type of case are often caught up in political strategies, designed to turn judicial or legislative minorities into majorities. Lawyers planning trial strategies are familiar with those tactics. But those who use them and lose have no equities that make constitutional what has long been declared to be unconstitutional. From the days of Madison, the issue of subsidy has never been a question of the amount of the subsidy but rather a principle of no subsidy at all.

The problem of retroactivity involved in criminal cases is therefore inapplicable. There the question is whether the newly announced rule goes to the fairness of the trial that had been completed under the old rule. See *Johnson* v. *New Jersey*, 384 U. S. 719, 726–729. Here there is no new rule supplanting an old rule. The rule of no subsidy has been the dominant one since the days of Madison. We deal with the normal situation that governs judicial decisions. Normally they determine legal rights and obligations with respect to events that have already transpired. By definition, courts decide disputes that have already arisen. A losing litigant has no equity in the fact that he "relied" on advice that turned out to be unreliable or wrong.[2] A decision overruling a prior authority may at times deny a litigant due process if applied retroactively. See *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill*, 281 U. S. 673. Only a compelling circumstance has been held to limit a judicial ruling to prospective applications. The disruptive effect in criminal law enforcement is one example. *Stovall* v. *Denno*, 388 U. S. 293, 300. Likewise, a ruling on the legality of municipal bonds has been given only prospective application where many prior bonds had been issued in good faith on a contrary assumption. *City of Phoenix* v. *Kolodziejski*, 399 U. S. 204, 213–215.

Retroactivity of the decision in *Lemon I* goes to the very core of the integrity of the judicial process. Constitutional principles do not ride on the effervescent arguments advanced by those seeking to obtain unconstitu-

---

[2] The rule of *Bruton* v. *United States*, 391 U. S. 123, which rejected *Delli Paoli* v. *United States*, 352 U. S. 232, was given retrospective effect. We said, "The element of reliance is not persuasive, for *Delli Paoli* has been under attack from its inception and many courts have in fact rejected it." *Roberts* v. *Russell*, 392 U. S. 293, 295.

tional subsidies. The happenstance of litigation is no criterion for dispensing these unconstitutional subsidies. No matter the words used for the apologia, the subsidy today given to sectarian schools out of taxpayers' monies exceeds by far the "three pence" which Madison condemned in his Remonstrance.

I would reverse the judgment below and adhere to the constitutional principle announced in *Lemon I*.