Norma PLUMLEY and Larry A.
Plumley, Petitioners,

v.

George E. HALE, M. D., Inc. and George
E. Hale, Respondents.

Eula Lee FIDLER and Donald Lee
Fidler, Petitioners,

v.

Peter O. HANSEN et al., Respondents.

Ellen ANAKA, Petitioner,

v.

ALASKA HOSPITAL & MEDICAL
CENTER.

Nos. 4014, 4017.

Supreme Court of Alaska.

May 4, 1979.

Lawrence J. Kulik, Anchorage, and Lloyd V. Anderson, Birch, Horton, Bittner & Monroe, Anchorage, for petitioners Norma Plumley and Larry Plumley.

L. Ames Luce, Kelly & Luce, Anchorage, for petitioners Eula Fidler, Donald Fidler, and Ellen Anaka.

Richard A. Helm, Burr, Pease & Krutz, Inc., Anchorage, for respondent Alaska Hospital & Medical Center.

Burton C. Biss, Biss & Holmes, Anchorage, for respondents George Hale, M. D., Inc., and George Hale.

James J. Delaney, Delaney, Wiles, Moore, Hayes & Reitman, Inc., Anchorage, for respondents Peter Hansen, M. D., and Kenai Medical Center, Inc.

Sigurd E. Murphy, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for respondents Roy Benward, the estate of James Harbin, and Peninsula Medical Center, Inc.

Arthur H. Peterson, Robert M. Maynard, Asst. Attys. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for intervenor the State of Alaska.

## OPINION

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and MATTHEWS, JJ., and DIMOND, Senior Justice.

MATTHEWS, Justice.

In these medical malpractice cases the trial courts ordered the use of expert advisory panels under AS 09.55.536, and upheld the constitutionality of that statute.[1] Petitioners challenge these orders on various grounds, all of which were rejected by the superior courts. We granted their petitions for review on one question only, namely whether AS 09.55.536 was enacted in violation of the recorded vote requirement of article II, section 14 of the Alaska Constitution.

The procedural history of the statute in question is not in dispute.[2] It was enacted as part of section 33, chapter 102 of the 1976 Session Laws of Alaska, the chapter being devoted to various matters pertaining to health care.[3] The bill was introduced in

---

1. At the time these orders were entered AS 09.55.536 provided in pertinent part:

   *Expert Advisory Panel.* (a) In an action for damages due to personal injury or death based upon the provision of professional services by a health care provider when the parties have not agreed to arbitration of the claim under § 535 of this chapter, the court shall appoint a three-person expert advisory panel unless the court decides that an expert advisory opinion is not necessary for a decision in the case. When the action is filed the court shall, by order, determine the professions or specialties to be represented on the expert advisory panel, giving the parties the opportunity to object or make suggestions.

   (b) The expert advisory panel may compel the attendance of witnesses, interview the parties, physically examine the injured person if alive, consult with the specialists or learned works they consider appropriate, and

   compel the production of and examine all relevant hospital, medical, or other records or materials relating to the health care in issue. The panel may meet in camera, but shall maintain a record of any testimony or oral statements of witnesses, and shall keep copies of all written statements it receives.

   (c) Not more than 30 days after selection of the panel, it shall make a written report to the parties and to the court . . . .

   (f) No discovery may be undertaken in a case until the report of the expert advisory panel is received. . . .

2. The major stages of this procedural history, with page references to the relevant house journals, are indexed in 1976 House Bill History 53.

3. Chapter 102 SLA 1976 established a comprehensive system to furnish hospitals and individual health care providers with medical mal-

the House as HB 574, was replaced by a committee substitute bill (CSHB 574), and on the third reading of the committee substitute, as amended, the bill was approved in the house by a recorded roll call vote of 29–0. 1976 House Journal 433. The bill was then engrossed, certified and sent to the Senate.

A Senate committee proposed an amended version of the bill (SCS CSHB 574), which was passed after the third reading by a recorded roll call vote of 19–0. 1976 Senate Journal 460. The bill as thus amended was returned to the House, where by simultaneous voice vote, the House refused to concur in the Senate amendments. The Senate then refused to recede from its amendments, also by simultaneous voice vote, and each house then designated three members to serve on a free conference committee.

The free conference committee under then current legislative rule 43(b) had the authority to propose and draft entirely new statutory provisions, as long as they were germane to the subject matter of the legislation being considered.[4] The free conference committee did in fact recommend adoption of a version of chapter 102 SLA 1976 that differed in many respects from the version originally passed by the House.[5] The free conference committee's bill (FCCS SCS CSHB 574) was passed by the Senate by a recorded vote of 17–3. 1976 Senate Journal 1314. In the House, however, there was no roll call or recorded vote; the free conference committee bill was passed there by a simultaneous voice vote. 1976 House Journal 1535.

practice insurance, requiring in certain instances, that such providers purchase their insurance only from the Medical Indemnity Corporation of Alaska, an entity created by the statute, and it adopted new licensing and disciplinary rules for members of the health care professions (§§ 5, 6, 7, 10, 14, 18, 21, 24, 28, 29, 32, 39, and 41); it provided protection for persons and organizations relating to the care and treatment of patients (§ 40); it authorized voluntary agreements between patients and providers to submit to arbitration any dispute arising out of health care and treatment (§ 33); and finally, it reshaped the legal rules pertaining to causes of action, burden of proof, discovery, admissibility of evidence, jury instructions, and damages, in medical malpractice actions (§§ 33–38).

4. In 1976, Rule 43(b) (now Rule 41(b)) of the Uniform Rules of the Alaska State Legislature provided that:

(b) Committee on Free Conference is appointed in the same manner as a Committee on Conference and may suggest in its report any new amendments germane to the question. When a majority of the membership on the committee from each house agree on amendments to be proposed, the amendments are attached to the bill and reported back to each house in an identical report. The report is not subject to amendment in either house. If the report is adopted in both houses the bill is then ordered enrolled by its house of origin. If the Committee on Free Conference fails to agree or its report is not adopted, a second Committee on Free Conference may be appointed but no member of the first committee may be reappointed.

5. With reference to malpractice actions, the following provisions appeared in the free conference committee bill, but not in CSHB 574. Arbitration agreements between health care provider and patient were authorized. Advance settlement payments by the defendant to the plaintiff were declared inadmissible evidence. References in the pleadings to the monetary amount claimed by a plaintiff were prohibited. Discretion was conferred on the trial judge to determine that no advisory panel was necessary; discretion to conduct nonspecified preliminary proceedings relative to the composition of the panel was eliminated. A ceiling was placed on the fee payable to a panel member called as an expert witness. The declaration of purpose was eliminated. In addition, the free conference committee bill required that the panel answer, not "substantially answer," eight questions that clarified and expanded the four questions specified in CSHB 574. It also amended provisions pertaining to the categories, computation, and collateral sources of damage awards.

With reference to the insurance system created by chapter 102 SLA 1976, the free conference bill made substantial revisions. It distinguished the obligations of doctors and hospitals from other health care providers, and provided for alternative insurance arrangements. It required that M.I.C.A. adopt one of several plans for risk management, created a Joint Underwriting Association for that purpose, promulgated new standards for operation of the Loan Fund, mandated that M.I.C.A. pay a premium tax, broadened the pool from which the M.I.C.A. board could be chosen, and shifted the power of appointment of the board from the director of insurance to the governor.

The petitioners contend that this voice vote constituted "final passage" of chapter 102 SLA 1976 and thus violated article II, section 14 of the Alaska Constitution:

PASSAGE OF BILLS. The legislature shall establish the procedure for enactment of bills into law. No bill may become law unless it has passed three readings in each house on three separate days, except that any bill may be advanced from second to third reading on the same day by concurrence of three-fourths of the house considering it. No bill may become law without an affirmative vote of a majority of the membership of each house. The yeas and nays on final passage shall be entered in the journal.

The respondents here, and the State of Alaska, as intervenor, argue that "final passage" is a legislative term of art, referring only to the initial passage of a bill in its house of origin, and to the initial passage of the bill, in amended or original form, by the second house. Thus it is argued that article II, section 14 does not apply to subsequent legislative action taken to resolve any discrepancies in the initial versions of a bill passed by the two houses.

■ We cannot agree that article II, section 14 was intended to be limited in the fashion suggested by the respondents. The requirement that the vote on final passage be by individual yeas and nays, and be recorded in the relevant house journal, is a formality embodying several purposes: to ensure deliberation prior to passage, to ensure that the requisite majority of each house affirmatively votes to enact a bill into law, and to provide a public record of the vote cast by each legislator. It is thus designed to engender a responsible legislative process worthy of the public trust.

These purposes would be ill-served if "final passage" were to be construed merely as a term of art. A free conference committee may substitute a bill which is entirely different from those presented to it by each house. We can think of no reason why such a bill should be exempt from the constitutional requirement of a recorded individual vote. The observation made by the Kentucky Supreme Court nearly one hundred years ago is no less true today:

The words "final passage" as used in our Constitution, mean final passage. They do not mean some passage before the final one, but the last one. They do not mean the passage of a part of a bill, or what is first introduced, and which may, by reason of amendment, become the least important. If so, then the body may pass what is practically a new bill in a manner counter to both the letter and spirit of the Constitution.

*Norman v. Kentucky Board of Managers of World's Columbian Exposition*, 14 Ky. 529, 20 S.W. 901, 902 (1892). It is in this clearest and most straightforward sense that we believe article II, section 14 was intended to be understood, and the sense in which the electorate that ratified it must have understood it.[6]

The argument that "final passage" always had a peculiar and specific meaning prior to the constitutional convention, is supported by historical proofs that are at best ambiguous. The Organic Act of Alaska[7] and the early internal rules of the territorial legislatures,[8] do seem to have imposed the formalities of final passage

---

6. We have noted in previous decisions that in construing our constitution we will favor an interpretation corresponding to the intent of the voters as well as that of the drafters. *See, e. g., State v. Lewis*, 559 P.2d 630, 637–38 (Alaska 1977).

7. Both the Organic Act § 13 (37 Stat. 512) and C.L.A. § 4–3–2 (1949) provided as follows:
   That a bill in order to become a law shall have three separate readings in each house, the final passage of which in each house shall be by a majority vote of all the members to

which such house is entitled, taken by ayes and noes, and entered upon its journal. That every bill, when passed by the house in which it originated or in which amendments thereto shall have originated, shall immediately be enrolled and certified by the presiding officer and the clerk and sent to the other house for consideration.

8. For example, Rules 7, 49, and 59 of the 1913 Rules of the House speak of final passage only in the context of a bill not yet sent to the Senate. 1913 House Journal 7, 14–15.

only on the initial passage in each house. However these usages of "final passage", rather than defining a term of art, can be viewed as reflecting the reality that the initial passage in a house was most frequently true final passage. As legislative procedures evolved, the inappropriateness of a limited definition of "final passage" became apparent. Thus we find the territorial legislature amending its rules [9] and practices,[10] albeit not consistently.[11] Also, while some courts prior to our constitutional convention had opted for a technical definition of "final passage" in their own constitution,[12] others had rejected such an interpretation.[13]

The first sentence of article II, section 14, demonstrates the drafters' anticipation that procedural changes would continue to occur.[14] At the same time article II, section 14 does not retain the juxtapositions giving rise to the limited construction of the Or-

ganic Act. Only the "three readings" requirement can be read as pertaining to the initial passage in each house. The "affirmative vote of the majority of the membership" and recorded vote requirements were not similarly limited, and are most naturally read as applying to the vote by which a bill actually and finally becomes law.

Utilization of the voice vote procedure has gained in frequency in recent times, and such legislative practice is entitled to interpretative weight. *See* C. Sands, 2A Sutherland's Statutes and Statutory Construction § 49.03 (4th ed. 1973). But the practice has not been consistent; the Senate has used it far less than the House of Representatives.[15] Furthermore, the legislature itself has recognized the problem; in 1977, Uniform Rule 41 of the Legislature was amended to require a formal "final passage" vote for the adoption of conference committee proposals.[16] Finally, we

9. For example, at least as early as 1933, Joint Rule 15 of the Senate and House of Representatives (found at 1933 House Journal 682) established that "[t]he report of the Committee on Conference or Free Conference must be agreed to by a majority of the members from each house;" the vote on such a report always came after third reading, and yet the "majority of the members" requirement was one reserved only for "final passage" by the Organic Act.

10. . *See, e. g.,* 1955 House Journal 617, wherein a free conference report is adopted with the formality accorded final passage.

11. *See, e. g., id.* at 749.

12. *See, e. g., School District No. 11 v. Chapman,* 152 F. 887, 890 (8th Cir.) *cert. den.* 205 U.S. 545, 51 L.Ed. 923 (1907); *Ewing v. McGehee,* 169 Ark. 448, 275 S.W. 766, 768 (1925); *State ex rel. Lane Drug Stores, Inc. v. Simpson,* 122 Fla. 582, 166 So. 262, 264 (Fla.1936); *Scott v. State Board of Assessment and Review,* 221 Iowa 1060, 267 N.W. 111, 114 (1936); *Johnson v. Great Falls,* 38 Mont. 369, 99 P. 1059 (1909).

13. *See, e. g., Cox v. Stults Eagle Drug Co.,* 42 Ariz. 1, 21 P.2d 914, 916 (1933); *Norman v. Kentucky Board of Managers of World's Columbian Exposition,* 14 Ky. 529, 20 S.W. 901, 902 (1892); *State v. Boyer,* 84 Or. 513, 165 P. 587, 589 (1917). *See also ex parte May,,* 118 Tex.Cr.R. 165, 40 S.W.2d 811, 813 (1931).

14. Indeed the first state legislature immediately made a major change. In the territorial legislature, if the two houses could not agree to the

identical version of a bill, a conference committee was appointed, which committee was restricted to recommending which of the provisions adopted by one or the other house, should appear in the final bill. Only if the conference committee failed to reach agreement, or if one house rejected the committee's recommendation, could a free conference committee be appointed. Joint Rules 13–14 of the Senate and House of Representatives (1955) (found at 1955 House Journal 824–5). The first state legislature altered this procedure to allow for the immediate appointment of a free conference committee. Uniform Rule 55 of the Alaska State Legislature (1959) (found at 1959 Session Laws at XVIII). In consequence, the number of bills enacted after free conference revisions rose from two in 1959, to forty-two in 1975–76. See 1959 House Journal Index and note 15 *infra.*

15. For example, of the forty-two bills emerging from free conference in 1975–76, the House adopted the committee's revisions by voice vote on thirty-six occasions, and the Senate on only nine. *See* 1975–76 Senate Bill History, at 234, 241, 246, 249, 250, 252, 256, 259, 275, 279, 292, 298, 300, 304, 306, 325, 353, 354, 355, 366. *See* 1975–76 House Bill History, at 6, 8, 11, 49, 53, 58, 59, 62, 68, 81, 96, 97, 107, 108, 156, and 158.

16. To the rule set forth *supra* note 4 the legislature appended these provisions:

The vote on adoption of a free conference committee report is taken by calling of the

note that the very first state legislature, in codifying article II, section 14, as AS 24.30.-080 and 24.30.090, did so in a fashion denoting its understanding that the "third reading" and "final passage" requirements were meant to be construed and applied as independent terms.[17] Authorities published subsequent to the constitutional convention support our interpretation of "final passage." *See Minnehaha County v. South Dakota State Board of Equalization*, 84 S.D. 640, 176 N.W.2d 56, 59–60 (1970); 1 Sutherland's Statutes § 14.04, at 386.[18]

■ We therefore hold that "final passage" refers to that vote which is the final one in a particular house with regard to a particular bill. Such a final vote may occur at various stages. It may be on the third reading of a bill; it may be the vote to concur in the amendments adopted by the second house; it may be the vote to recede from amendments not concurred in by the other house; or it may be the vote to adopt the amendments proposed by a conference committee.[19]

■ Whether a vote is the final one in a particular house is naturally a fact as-

certainable only in retrospect, since whether a house has cast its final vote will frequently depend upon the action subsequently taken in the second house. We recognize that this uncertainty will compel a formal tally of votes whenever a vote has the potential to be the final one. However, the purposes served by the recorded vote requirement justify whatever burdens may be felt by the legislature in recording several votes rather than one.[20]

## II

■ We now turn to the issue of the retroactive application of today's holding. Absent special circumstances, a new decision of this court will be given effect in the case immediately before the court, and will be binding in all subsequent cases in which the point in question is properly raised, regardless of the fact that the events to which the law is applied occurred prior to the actual decision of the Court. In a number of our cases however, we have recognized that on occasion, the interests of justice may demand that a new rule of law only be applied prospectively.[21] We find

roll and the recording of the ayes and nays in the journal. Adoption requires a majority of the membership of the house.

Identical rules were adopted for the voting on ordinary conference committee reports as well, in what currently is Rule 41(a).

**17.** These sections provide as follows:

Sec. 24.30.080. *Readings.* No bill may become law unless it has passed three readings in each house on three separate days, except that a bill may be advanced from second to third reading on the same day by concurrence of three-fourths of the house considering it.

Sec. 24.30.090. *Vote on passage.* No bill may become law without the affirmative vote of a majority of the membership of each house. The yeas and the nays on final passage shall be recorded in the journal.

**18.** The respondents cite P. Mason, Manual of Legislative Procedure (1970), which manual the legislature has adopted to cover parliamentary procedure not covered by rule or law. Uniform Rule 54 of the Alaska State Legislature. In § 771, Mason notes that the vote on conference committee reports is not a vote upon "final passage." However Mason is merely citing common practice, and moreover is referring

only to non-free conference reports. *See* §§ 772–4.

**19.** While it is the voice vote on a free conference report that is specifically challenged by petitioners, in order to preclude future uncertainties we do not limit our interpretation to that context. The legislature, despite the rule changes noted in the opinion with regard to voting on conference reports, apparently still permits a voice vote when concurrence in the second house's amendments, or recession from one's own amendments, is at issue. See Uniform Rules 40–41(a) of the Legislature (1977). Since such votes constitute a vote on substantive provisions not yet approved, we fail to see why the formalities required for "final passage" should not apply.

**20.** Since the legislature now uses an electronic voting device, a recorded vote does not consume significantly more time than a voice vote.

**21.** For a comprehensive discussion by this court of prospective decision-making, *see Rutherford v. State*, 486 P.2d 946, 952–56 (Alaska 1971); *Judd v. State*, 482 P.2d 273, 276–79 (Alaska 1971). *See generally*, B. Levy, *Realist Jurisprudence and Prospective Overruling*, 109 U.Pa.L.Rev. 1 (1960); Note, *Prospective Over-*

that today's holding requires this treatment.

In accord with United States Supreme Court precedent,[22] we have previously identified four conditions indicating the propriety of non-retroactive treatment in civil cases: 1) the holding is one of first impression, or overrules prior law, and was not foreshadowed in earlier decisions; 2) there has been justifiable reliance on an alternative interpretation of the law; 3) undue hardship would result from retroactive application; and 4) the purpose and intended effect of the holding is best accomplished by prospective application. *Moore v. State,* 553 P.2d 8, 28 (Alaska 1976); *Warwick v. State ex rel. Chance,* 548 P.2d 384, 393–6 (Alaska 1976); *Schreiner v. Fruit,* 519 P.2d 462, 466–7 (Alaska 1974). *See also State v. Aleut Corporation,* 541 P.2d 730, 740 n. 25 (Alaska 1975).

The petitioners concede that with respect to the first of the foregoing criteria, the issue decided today is one of first impression in Alaska, and that our holding was not clearly foreshadowed at the time chapter 102 SLA 1976 was enacted. It is likewise incontestable that the second and third factors that we must consider, justifiable reliance and undue hardship, are present in an overwhelming degree in this case. The reliance is of two sorts. It is clear that the Alaska legislatures that have de facto interpreted "final passage" as "third reading," have done so in good faith, on the basis of respectable precedent.[23] It is the reliance on and potential hardship resulting from the legislatures' acts, however, with which we are primarily concerned.

The reliance of the legislature on the constitutionality of its voice vote procedure has resulted in the enactment of a great many statutes by the identical process challenged today. In 1975–76 alone, at least thirty-seven bills became law by virtue of a voice vote approval by at least one house of free conference committee amendments. See *supra* note 15. Such legislation was concerned with such diverse and critical subjects as aid to the handicapped, leasing of state land, criminal assault, day care, pharmacists, operating expenses of the state government, the income tax, school construction, public employees' retirement, workers' compensation, employment of Alaska residents, flood control, minimum wage, municipal revenue sharing, bank records, consumer protection, the residential homestead exception, the University of Alaska, public employee salaries, possession of weapons, motorcycle safety, airport improvements, general bond obligations, and dissolution of marriage. While the public's reliance on the validity of these statutes is not precisely calculable, it is clear that it is profound and permeates every stratum of Alaska society. To apply today's holding retroactively so as to make each of these statutes subject to challenge, "would have an impact upon the administration of . . . [state] law so devastating as to need no elaboration." *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 419, 86 S.Ct. 459, 467, 15 L.Ed.2d 453, 461 (1966).

Likewise, the enactment of chapter 102 SLA 1976 has itself fostered a justifiable and significant degree of reliance. Pursuant to a procedure arguably proper under article II, section 14, the legislature created the Medical Indemnity Corporation of Alaska, and with it a malpractice insurance scheme that was obligatory upon all physicians and hospitals in this state, and potentially obligatory upon all health care providers. *Supra* note 3. In accordance with the provisions of that statute, insurance was purchased and health care provided, in the belief that the authority of the State of Alaska stood behind and assured the validity of such insurance policies. While the obligatory aspects of the statute have been

---

*ruling and Retroactive Application in the Federal Courts,* 71 Yale L.J. 907 (1962).

**22.** *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106–7, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 (1971).

**23.** See notes 7, 8, and 12 *supra,* and accompanying texts.

repealed,[24] the reliance of past and present policyholders remains unaffected.[25] In the absence of convincing reasons to do otherwise, we are loathe to disturb these contracts.[26]

Finally, with respect to the fourth criterion that we must consider, the purpose of the holding, we find that the rationale of our holding today is neither inconsistent with prospective application, nor compels retroactive application. To strike down a statute on the basis of an article II, section 14 procedural error would serve the end of vindication of the substantive objectives of the recorded vote requirement. In the present context we are forced to recognize that the harshness of the remedy is disproportionate with achievement of this purpose.

First, a statute enacted by voice vote in one house on final passage, but preceded by an individual recorded vote on third reading, hardly indicates a total failure of the substantive objectives of the individual recorded vote requirement. A very different question would be presented were a statute enacted without benefit of an individual recorded vote at any stage. In such a case there would be no objective assurance of deliberation or majority passage, and no record of the vote of individual legislators. Furthermore, in the particular case of chapter 102 SLA 1976, additional assurances of no substantive harm are provided by the facts that the vote recorded in the House of Representatives on the third reading of the bill was 39 to 0, 1975–76 House Bill History 433, no representative made objection to the voice vote on the free conference revisions,[27] *id.* at 1535, and that the Senate vote on final passage was recorded in strict compliance with article II, section 14. 1975–76 Senate Bill History 1314. Finally, the general constitutional objective of securing the public trust in the legislative process would hardly be furthered by striking down chapter 102 SLA 1976 or any of the myriad statutes enacted by similar procedures.

■ In light of our conclusions that today's decision is one of first impression, that substantial reliance has followed from the legislature's alternative interpretation of law, that undue hardship would result from retroactive application of our holding, and that the rationale of today's holding does not compel retroactivity, we hold that any statute heretofore passed by voice vote on final passage, subsequent to a recorded vote on third reading, shall be immune from challenge under our holding in Part I of this decision.

The petitioners here recognize that the severe consequences that would follow a retroactive holding compel prospectivity. Accordingly, they seek only a limited form of retroactivity, so that at least they might benefit from today's holding.

■ It is fundamental that the determination as to whether a decision will be prospectively or retroactively applied, is one guided by equitable principles.[28] This court

24. Repealed by § 40 ch. 177 SLA 1978.

25. § 21(a) ch. 177 SLA 1978 assures the validity of all policies purchased under the repealed provisions of ch. 102 SLA 1976. M.I.C.A. coverage, pursuant to AS 21.88.050(a)(1), is now optional.

26. In any society it must be considered an intolerable operation, after the State, through its duly constituted organs, has pronounced a rule of law upon which the citizen relies when, later, the State, through the same organs, takes away from that citizen the rights or liberties he has fashioned in reliance on what has been officially declared.
A. Kocourek and H. Koven, *Renovation of the Common Law Through Stare Decisis,* 29 Ill.L. Rev. 971, 972 (1935). *See also* P. Mishkin,

*Foreword: The High Court, The Great Writ, and the Due Process of Time and Law,* 79 Harv.L.Rev. 56, 70 n. 47 (1965); Note, *Prospective Operation of Decision Holding Statute Unconstitutional or Overruling Prior Decision,* 60 Harv.L.Rev. 437 (1947).

27. We note that "[a] roll call vote on any measure may be demanded by one-fifth of the membership of the house." Rule 33(a), Uniform Rules of the Alaska State Legislature (1977).

28. In *Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), the Supreme Court identified the prospectivity/retroactivity judgment as within a court's equitable powers, and observed that:
[E]quitable remedies are a special blend of what is necessary, what is fair, and what is

has therefore recognized that a prospective holding need not be purely prospective. *See Warwick v. State ex rel. Chance,* 548 P.2d 384, 393 (Alaska 1976). On numerous occasions, fairness has required that at least the litigants who successfully urged adoption of a new rule in this court be afforded relief, though the new rule was otherwise given only prospective application.[29] Indeed the United States Supreme Court has observed that any other result would be "most unusual." *Simpson v. Union Oil Company,* 396 U.S. 13, 14, 90 S.Ct. 30, 31, 24 L.Ed.2d 13, 15 (1969).

In the instant case we cannot ignore the fact that these petitioners are one-time litigants who in all likelihood will not benefit from today's holding in any future litigation. We are also mindful that the evolution of legal principles depends in large part on the incentive provided private parties to devote energies and resources to raising, briefing, and arguing new issues with the requisite skill and care. Several authorities have recognized the weight of these considerations.[30]

A form of relief may be afforded these petitioners that accommodates these considerations without compromising the principles that otherwise compel prospectivity.

The petitioners' constitutional challenge arose by virtue of the trial courts' various rulings pertaining to expert advisory panels under AS 09.55.536, enacted as part of section 33, chapter 102 SLA 1976. The respondents have not taken any actions in reliance on the advisory panel provision nor can we see that depriving them of its operation will cause undue hardship.

■ We have already determined that neither chapter 102 SLA 1976, nor any other bill previously enacted into law by voice vote, will be overturned by today's interpretation of article II, section 14, and thus we do not invalidate AS 09.55.536. However, in order to effectuate the goals of fairness and intelligent advocacy, we also hold that AS 09.55.536 will not be applicable in the malpractice actions consolidated for this appeal.[31] In every other respect today's holding will be purely prospective.

BURKE, J., not participating.

workable. . . . In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots.
*Id.* at 200–201, 93 S.Ct. at 1469, 36 L.Ed.2d at 161–162 (footnote omitted).

29. *See e. g., Lauderdale v. State,* 548 P.2d 376, 383 (Alaska 1976); *State v. Aleut Corporation,* 541 P.2d 730, 740 n. 25 (Alaska 1975); *Fairbanks v. Schaible,* 375 P.2d 201, 211 (Alaska 1962). *Compare State v. Buckalew,* 561 P.2d 289, 292 (Alaska 1977), *with Gordon v. State,* 577 P.2d 701, 705 (Alaska 1978). *See also Moore v. State,* 553 P.2d 8, 39 (Alaska 1976) (Dimond, J., dissenting).

30. *Dawson v. Olson,* 94 Idaho 636, 496 P.2d 97, 101, (1972); *Molitor v. Kaneland Community Unit Dist. No. 302,* 18 Ill.2d 11, 163 N.E.2d 89, 97 (1959), *cert. den.,* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21, 29 (1969); *Kojis v. Doctors Hospital,* 12 Wis.2d 367, 107 N.W.2d

292, 294 (1961). *See People v. Hitch,* 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361, 371 (1974) (Mosk, J., dissenting); W. Schaefer, The Control of "Sunbursts": *Techniques of Prospective Overruling,* 42 N.Y.U.L.Rev. 631, 638 (1967). We note in passing that many cases afford relief to the immediate litigant, while otherwise applying a rule prospectively, without offering an express rationale. *Compare, e. g., Miranda v. Arizona,* 384 U.S. 486, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *with Johnson v. New Jersey,* 384 U.S. 719, 721, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

31. We decline to consider the argument of Alaska Hospital and Medical Center, Inc., that the legislature corrected the defect in passage of AS 09.55.536 by adding a technical amendment to subsection (a) thereof in 1978 which passed by a recorded vote in both houses, since that argument was not raised in opposition to the petition for review and is beyond the scope of the supplemental briefing ordered by the court.