# Rhymer's Appeal.

1. A testator, by a will executed within one month of his death, left a bequest to a church to be expended in masses for the repose of his soul. The Act of April 26th 1855, Pamph. L. 332, prohibits devises or legacies for charitable or religious uses, unless by will executed at least one month before the death of testator. *Held*, that the bequest was within the statute and void.

2. Per STERRETT, J. : While this may not be regarded as a charitable use, within the accepted meaning of the word, it is certainly, in every proper sense of the term, and according to the obvious intendment of the act, a religious use.

February 6th 1880. Before MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. SHARSWOOD, C. J., and GREEN, J., absent.

Appeal from the Orphans' Court of *Philadelphia county:* Of January Term 1878, No. 234.

Appeal of Anastatia Rhymer, late Anastatia Power, and Charles

[Rhymer's Appeal.]

G. Stewart, guardian of John and Mary Power, from the decree of the court sustaining the exceptions to the report of the auditing judge in the estate of Martin Power, deceased.

Martin Power died July 23d 1874, leaving a will, dated July 9th 1874. In this will he made a number of specific bequests, among which were several to Catholic institutions, and the residue of his estate he disposed of as follows:

"Item. All the rest, residue and remainder of my estate I give and bequeath to St. Mary's Catholic Church, to be expended in masses for the benefit and repose of my soul."

The account of the executors of the decedent was audited by Hanna, P. J., who held that the residuary bequest was for a "charitable" and "religious" use, and was void by virtue of the Act of April 26th 1855, and that the amount thereof should be awarded to the appellants, the heirs of testator. Exceptions were filed to this ruling on behalf of St. Mary's Church, which the court sustained, Ashman, J., delivering the following opinion: "The testator, after making provision for all the members of his family, devised the residue of his estate to St. Mary's Catholic Church, to be expended in masses for the benefit and repose of his soul. He died within thirty days after the execution of his will. The residue of his estate amounted to $649.79.

"The question is, was this a devise to a charitable or religious use within the meaning of the Act of 26th April 1855?

"There can be no doubt, that in England it would be regarded as a superstitious use, and therefore void. The making of a gift to procure the saying of masses for the soul of a devisor, was one of the superstitious uses prohibited by the statute of 1 Edw. D. 6, c. 14. But a superstitious use can hardly be said to exist in this country, where in the absence of any state religion there can be no standard of orthodoxy: Methodist Churches v. Remington, 1 Watts 224. It was said in McLean v. Wade, 5 Wheat. 266, that 'a religious purpose is a charitable purpose.' Sir. Thomas Plumer defines a charitable use in these words: 'Where the donor appropriates a gift, either to charity or some public purpose, such as the repair of bridges, ports and havens, not operating in any manner to the benefit of himself:' Melick v. The Asylum, 1 Jac. C. C. 180. But the best definition of what constitutes a charitable purpose is that of Binney, adopted by the court in Price v. Maxwell, 4 Casey 23, and in other cases.

"'Whatever is given for the love of God, or for the love of our neighbor, in the catholic and universal sense, given from these motives and to these ends, free from the stain of everything that is personal, private or selfish, is a gift for charitable uses.'

"A religious use may be said to be such a charity with the infusion of a religious element. It is difficult to see how the present devise can be brought within the terms of this definition; so

[Rhymer's Appeal.]

far from being free from everything of a personal, private or selfish nature, it had its origin in a motive which was in the highest degree personal and selfish.

" The fact that the church might remotely profit by the money the testator chose to pay for its mediation, in no sense elevated the gift to the rank of a gift for the advancement of religion; the object of the testator was as purely private and selfish as if he had bequeathed a fund to the church for the erection of a monument to himself, or the purchase and maintenance of a pew for his family, both of which gifts have been held not to be charities: Roper on Legacies, vol. 2, p. 138.

" It may be said that the practical effect of this construction would be to evade the statute; we do not believe that any such intention was in the mind of the testator; but even if the fact be admitted the remedy is with the legislature, and not the court.    In Schultz's Appeal, 30 P. F. Smith 396, which arose under this act, the court expressly admitted that the evident intention of the testator was to avoid the statute, but it nevertheless gave effect to his gift.

" It is not pretended that the question is free from embarrassment.    The Act of 1855 was meant to save men from the force of solicitation addressed to them under the sanction of religion in the near view of death; but as that act is in derogation of the absolute right of all men to control the disposition of their own property, it should be strictly construed.    It has been the practice to award a moderate sum in payment of the services of mass in cases when the decedent is of the Catholic faith, as a part of the funeral expenses, if the testator's belief in the continued efficacy of these prayers leads him to devote the property to securing them after death.    One should be careful that under cover of the statutes intended to protect him from imposition, we do not hinder him in the exercise of what he may regard as a religious duty.    It is easy to imagine cases in which the testator might leave the bulk of a large estate to the church in payment of masses for the repose of his soul. But it must be remembered that the fund can never be divested for the benefit of the church from its original purpose, and that, on the first attempt at diversion, equity will intervene and raise another trustee to administer it according to the intention of the donor: Schnorr's Appeal, 17 P. F. Smith 138.    The exceptions to the adjudication are sustained, and the accountant is ordered to pay to St. Mary's Catholic Church the sum of $649.79, for the purpose and in accordance with the will of the decedent."

From this decree this appeal was taken.

*F. W. Patten* and *H. F. Hepburn*, for appellants.—Bequests to pay for religious services have been held " charitable," as also bequests for an object which was personal and selfish: Penstred *v.* Payer, Duke Ch. U. (Bridgman) 381 ; Durour *v.* Motteux, 1 Ves.

[Rhymer's Appeal.]

320; Lloyd *v.* Lloyd, 16 Gur. 306; Dexter *v.* Gardner, 7 Allen 247; Swasey *v.* Am. Bible Soc., 57 Me. 524; Gravenor *v.* Hallum, Amb. 643; McGirr *v.* Aaron, 1 P. & W. 49; Grieves *v.* Case, 2 Cox Ch. 301; Attorney-General *v.* Combe, 2 Vern. 267. The church receives the money devised, and although it is stated to be a recompense for services, or given from selfish motives, the real object and the actual result should be regarded. The decision of the court below would nullify the statute: McGirr *v.* Aaron, *supra;* Dexter *v.* Gardner, *supra.*

The word " religious " has an additional force, and if the devise was not charitable it is within the term religious, and therefore void under the statute of April 26th 1855. This word has no legal and technical signification like the word " charitable," and is to be interpreted in its ordinary and well-known sense: Webster's Dictionary; Blackstone Com. (Sharswood) 59, and cases cited; Miller *v.* Porter, 3 P. F. Smith 297; Dexter *v.* Gardner, *supra.* The statute is to have a liberal construction, and the object with which it was passed should be regarded: Price *v.* Maxwell, 4 Casey 33; Shelford on Law of Mortmain 122.

*A. A. Hirst,* for appellee.—Martin Power, by his residuary devise, intended to benefit no one but himself. By it he did not intend to benefit his fellow-man or advance the cause of religion. It was a devise purely private, personal and selfish. He had already provided for each and every member of his family, for the charitable institutions of his faith, and for his parish church. The court below found those devises to be void under the Act of 1855, and no exception is taken to such finding.

The money bequeathed under the residuary clause to a trustee to expend in his behalf, he intended should be and will be applied to pay for time and services rendered in that behalf. This and no other court in this country can determine whether such service, so rendered, will be efficacious, or interfere with Martin Power's belief therein.

Mr. Justice STERRETT delivered the opinion of the court, March 1st 1880.

By the residuary clause of his will, executed fifteen days before his death, the testator bequeathed " all the rest, residue and remainder" of his estate " to St. Mary's Catholic Church, to be expended in masses for the benefit and repose of " his soul.

It is contended that the bequest is void under the Act of 1855, the 11th section of which declares that " no estate, real or personal, shall hereafter be bequeathed, devised or conveyed to any body politic, or to any person, in trust for religious or charitable uses, except the same be done by deed or will attested by two credible and at the same time disinterested witnesses, at least one calendar month before the decease of the testator or alienor, and

12 NORRIS—10

[Rhymer's Appeal.]

all dispositions of property contrary hereto shall be void and go to the residuary legatee or devisee, next of kin or heirs according to law."

While the propriety of legislation which thus limits the right of giving for religious or charitable purposes may sometimes have been questioned, it has never been doubted that the act is constitutional, and the only question presented for our consideration is whether the residuary bequest is for either a religious or charitable use, and therefore falls within the prohibition of the statute.

The testator has clearly declared the use or purpose to which his bequest shall be applied. It is to be expended in masses for the benefit and repose of his soul. While this may not be regarded as a charitable use within the accepted meaning of the word, it is certainly in every proper sense of the term, and according to the obvious intendment of the act, a religious use. In the denomination with which the testator appears to have been identified the mass is regarded as a prominent part of the religious service and worship. According to the Roman Catholic system of faith there exists an intermediate state of the soul, after death and before final judgment, during which guilt incurred during life and unatoned for must be expiated; and the temporary punishments to which the souls of the penitent are thus subjected may be mitigated or arrested through the efficacy of the mass as a propitiatory sacrifice. Hence the practice of offering masses for the departed. It cannot be doubted that in obeying the injunction of the testator and offering masses for the benefit and repose of his soul the officiating priest would be performing a religious service, and none the less so because intercession would be specially invoked in behalf of the testator alone. The service is just the same in kind whether it be designed to promote the spiritual welfare of one or many. Prayer for the conversion of a single impenitent is as purely a religious act as a petition for the salvation of thousands. The services intended to be performed in carrying out the trust created by the testator's will, as well as the objects designed to be attained, are all essentially religious in their character.

It appears to us that the bequest to St. Mary's Catholic Church was clearly for a religious use, and therefore void according to the express terms of the statute. It follows that the schedule adopted by the auditing judge should have been confirmed by the court.

The decree of the Orphans' Court is reversed at the costs of the appellee, and it is now adjudged and decreed that the residuary fund, viz., $643.79, be distributed as follows, to wit: To Timothy Kelly, administrator of Mary Power (widow), $214.59; to Anastatia Power, $143.06; to Charles E. Stewart, guardian of John Power, $143.07; to Mary Power, $143.07.