**Heilig Estate**

*William Carson Bodine,* for accountant.
*Henry B. Fitzpatrick, Jr.,* for assignee's executor.

*Herbert Molin,* for Commissioner of Social Services, New York City.

*Ralph C. Busser, Jr., Edward M. David, Scudder Stevens, Richard A. Rosenberger* and *Elvin R. Souder,* for charities.

*Lawrence Barth,* for Commonwealth.

GUTOWICZ, *J.,* January 30, 1979—Ralph Bertolet Heilig (Heilig) died April 1, 1948, having made a will dated March 20, 1948, in which he appointed Girard Trust Company as executor of his estate, to which company letters testamentary were granted April 23, 1948. Item 10 of Heilig's will provided as follows:

"10. I give, devise and bequeath the rest, residue and remainder of my estate unto my Executors, and the survivor of them, In Trust, nevertheless, to invest and reinvest the same and to pay the net income therefrom unto my sister-in-law, Albertina Z. Stubbs, and, at her death, the same to be converted into cash and divided into four equal parts which I give and bequeath in the following manner: (my sister-in-law is to be given the privilege of selecting any of my personal effects, such as jewelry, old coins, furniture, silverware, etc.).

"*One part* to my niece, Ruth E. Heilig Bickham (last known address: 510 North Franklin Street, Phila., Pa.) if she can be located within one year, otherwise this portion is to be divided among the remaining three parts.

"*One part* to the Home for Incurables—Phila., Belmont and Conshohocken Avenue—in memory of my loving wife, Anna E. Heilig.

"*One part* to the Mennonite Home, located at Frederick, Upper Frederick Township, Montgomery County, Pa.,—in memory of my loving mother, Deborah Bertolet Heilig.

"*One part* to the Shriners Hospital for Crippled Children, Roosevelt Boulevard—in memory of my dear father, George E. Heilig." A copy of the will is annexed.

The testator was survived by his said sister-in-law (Stubbs) and his said niece (Bickham), the latter being his sole known intestate heir according to the Pennsylvania Law of Intestate Succession, 20 P.S. §1.3, now 20 Pa.C.S.A. §2103.

The account of Girard Trust Company, the executor of the Heilig Estate, was called for audit on May 2, 1949, before Judge Ladner of the Orphans' Court of Philadelphia, who filed an adjudication dated June 3, 1949. A copy of said adjudication is attached hereto. The charitable beneficiaries under the will (the charities) did not appear at audit although they had received notices of audit which stated, in part: "This notice is sent to you in accordance with the rules of the court although you have been previously advised it would appear that your bequest is void, the will having been executed within thirty days of the testator's death." Copies of these notices of audit are annexed hereto. Bickham appeared through counsel in two capacities: as remainderman and heir-at-law.

Paragraph (i) of the statement of proposed distribution submitted to Judge Ladner on the audit of the executor's account states: "The Court's attention is directed to the fact that the decedent died within 30 days of executing his Will so that the legacies to the Home for Incurables, Mennonite Home and Shriners Hospital for Crippled Children are void." A copy of the said statement of proposed distribution is annexed hereto. The aforesaid statement undoubtedly prompted the following statement by the auditing judge, at page 4 of the adjudication:

"So far as the charities above named or referred to are concerned, the Court's attention is directed to the fact testator died within thirty days of the execution of his will. Under Sec 7 (1) of the Wills Act of 1947, a charitable bequest in such circumstances is invalid 'unless all who would benefit by its invalidity agree that it shall be valid.'"

There was no agreement by Bickham to validate the bequests to the charities named in Heilig's will. Stubbs having survived the testator, Judge Ladner awarded the balance remaining for distribution to the Girard Trust Company, Trustee, " . . . in trust for the uses and purposes as declared by the will."

The account is of the fund awarded in trust by Judge Ladner and is filed by reason of the death of Albertina Z. Stubbs (Stubbs), life tenant, on December 31, 1976. The trust terminates.

Ruth E. Heilig Bickham Fortugno (Bickham) died April 28, 1967, a resident of Brooklyn, Kings County, New York. A copy of her death certificate is annexed hereto. It is stated that no one has qualified to administer her estate and that her sole known next of kin is her aunt, Carrie Wilson, who still survives. The three charities mentioned in the will still exist.

On December 5, 1974, the Pennsylvania Supreme Court, in Cavill Estate, 459 Pa. 411, 329 A. 2d 503 (1974), declared section 7(1) of the Wills Act of April 24, 1947, P.L. 80, as amended, 20 P.S. §180.20 et seq., unconstitutional. The Pennsylvania Legislature repealed the successor to section 7(1) of the Wills Act of 1947, that is, section 2507(1) of the Probate, Estates and Fiduciaries Code, 20 Pa.C.S.A. §2507(1), on July 9, 1976.

It is stated that notice of the audit has been given to all parties having a possible interest in the trust, including the attorney general as parens patriae for charities who has entered an appearance.

The statement of proposed distribution and notices to the parties in interest raise two issues for adjudication:

"(2) Ruth E. Heilig Bickham Fortugno having died April 28, 1967 prior to the termination of the Trust by the death of the life tenant, Albertina Z. Stubbs, on December 31, 1976, does she fulfill the condition that she 'be located within one year?'

"(1) The Testator having executed his Will March 20, 1948 and died April 1, 1948, are the remainder bequests to the Home for Incurables— Phila., Mennonite Home, and Shriners Hospital for Crippled Children valid and effective?"

The accountant took the following positions in its notices of audit, copies of which are annexed hereto:

"Upon advice of Counsel on the above facts, it is the position of the Accountant that the bequest of the one-quarter remainder interest to Ruth E. Heilig Bickham Fortugno was conditioned upon her surviving Mrs. Stubbs the life tenant, and being found within one year of the life tenant's death, that this condition was not met since she predeceased the life tenant by almost ten years; and, accordingly, neither her estate nor her heirs at law if any, nor her assignees have any interest in the fund.

"Upon the advice of Counsel it is the position of the Accountant that the bequests to the three (3) named Charities, augmented by the gift to Ruth since she did not meet the conditions, are valid and

effective because of the unconstitutionality of the provision invalidating charitable bequests made by wills executed within thirty days of death contained in section 7(1) of the Wills Act of 1947.

"Accordingly, the Accountant intends at the audit to recommend to the Court that one-third of the principal and income accrued since December 31, 1976 be distributed to each of the three named Charities; namely: HOME FOR INCURABLES— PHILA., MENNONITE HOME, and SHRINERS HOSPITAL FOR CRIPPLED CHILDREN."

Central Penn National Bank has entered its appearance as Executor of the Estate of Joel Cook Huber, deceased (Huber). Mr. Huber is alleged to have been an assignee of Ruth E. Heilig Bickham Fortugno (Bickham), the testator's said niece, by written bills of sale dated September 14, 1949, and September 13, 1960, the originals of which appear in this record as Exhibits "CP 29" and "CP 30," respectively. Blanche Bernstein, Commissioner of Social Services, New York City, has entered her appearance as successor to Joseph H. Louchheim, Commissioner of Welfare of the City of New York, claiming by written assignment dated February 3, 1966, a copy of which is annexed to the statement of proposed distribution submitted by the accountant. The three charitable remaindermen (the charities) under the will of Ralph Bertolet Heilig have entered their appearances to (a) deny the existence of the aforesaid assignments; (b) attack the assigments to Huber as being usurious; and (c) to adopt the positions taken by the accountant in the notices of audit, to wit, that Bickham's one-fourth interest in the trust as a remainderman never became vested because she failed to survive the life tenant, that this interest passed to the charitable remaindermen, in equal shares, by the terms of Item 10 of Heilig's

will, and that the mortmain statute (section 7(1) of the Wills Act of 1947) having been declared unconstitutional in Cavill, supra, the entire principal of the trust, together with income accrued since the death of the life tenant (Stubbs), December 31, 1976, should be distributed to the charities.

At the outset of the hearings in this matter, counsel presented the court with a stipulation, the original of which is annexed hereto. Huber then presented four witnesses and offered thirty exhibits in efforts to prove that Bickham did make the alleged assignments to Huber; that Huber's anticipated returns on his said investments were not usurious; that the assignments were made in good faith reliance upon the operation of the mortmain statute (section 7(1) of the Wills Act of 1947) and the Pennsylvania Law of Intestate Succession, 20 P.S. §1.3, now 20 Pa.C.S.A. §2103, to indefeasibly vest the entire remainder interest in Bickham, his assignor; and that, in further reliance upon the title vested in his assignor by operation of the said laws, Huber subsequently reassigned his "interests" in this trust, reacquired them and, upon his death, they were taxed as assets of his estate by both the Federal Government and the Commonwealth of Pennsylvania.

The charities object to most of the testimony and all of the exhibits proffered by Huber, on the basic ground of relevancy. Their position is summarized, at page 10 of their initial brief, in the following words:

"The Pennsylvania Supreme Court in Cavill Estate, 459 Pa. 411, 329 A. 2d 503 (1974) held the Mortmain statutes to be *unconstitutional* and not to be given any effect. Thus the Mortmain statutes are not and never were valid. It is a general rule that an unconstitutional statute is as if it had never

been. Claimant ["Huber"] has not presented any exception to that rule which is applicable to him, because there is none."

In the view of the charities, then, Cavill must be applied retroactively, as as to destroy Huber's "interests" acquired by assignment from Bickham, unless Huber comes within an exception to the "general rule" that unconstitutional statutes are void ab initio. The only "exceptions" recognized by the charities are actions taken in justifiable reliance upon some judicial act, that is, upon some court ruling that the statute subsequently declared unconstitutional was, at one point in time, constitutional. There having been no ruling by the Pennsylvania Supreme Court, prior to Cavill, expressly upholding the constitutionality of the mortmain statutes, the charities call for a retroactive application of Cavill and object to Huber's "reliance" testimony and exhibits as being irrelevant.

However, the aforesaid position of the charities carries little weight in light of the abandonment of the "general rule" by the United States Supreme Court, in Chevron Oil Company v. Huson, 404 U.S. 97, 106, 92 S.Ct. 349, 30 L.Ed. 2d 296 (1971), and in Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed. 2d 151 (1973); and by the Pennsylvania Supreme Court, in Schreiber v. Republic Intermodal Corp., 473 Pa. 614, 375 A. 2d 1285 (1977). Chevron laid down three separate factors, or guidelines, to be considered in cases dealing with the nonretroactivity question:

"First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied . . . [citation omitted] or by deciding an issue of first impression whose resolution

was not clearly foreshadowed. . . . [citation omitted] Second, it has been stressed that 'we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.' . . . [citation omitted] Finally, we have weighed the inequity imposed by retroactive application, for '[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity.'" (Citation omitted.)

As the court said in Lemon, supra, at 198, 199:

" . . . Consequently, our holdings in recent years have emphasized that the effect of a given constitutional ruling on prior conduct 'is subject to no set "principle of absolute retroactive invalidity" but depends upon a consideration of "particular relations . . . and particular conduct . . . of rights claimed to have become vested, of status, of prior determinations deemed to have finality"; and "of public policy in the light of the nature both of the statute and of its previous application."' [citations omitted] However appealing the logic of Norton [the general rule] may have been in the abstract, its abandonment reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. Appellants offer no persuasive reason for confining the modern approach to those constitutional cases involving criminal procedure or municipal bonds, and we ourselves perceive none."

In adjudicating Huber's claim (as an assignee of Bickham), then, this court must engage in the process of reconciling the constitutional interests reflected in the Cavill holding with reliance interests stemming from the contracts of assignment allegedly premised on the validity of the mortmain statutes. Huber's "reliance" testimony and exhibits are thus relevant to the issues in the case at bar. Therefore, the charities' objection to Exhibits "CP 1, 3, 4, 6, 8, 10, 14, 16, 17, 19, 20, 21, 22, 23, 24, 25, 26, 27, and CP 28," on the grounds that these exhibits are irrelevant, are overruled and the said exhibits are received into evidence.

The charities' objections to Exhibits "CP 7 and CP 11" are sustained and they are stricken from the record because they were not properly authenticated. Likewise, the charities' objections to Exhibits "CP 2, 9, 12, 13, 15 and CP 18" are sustained and the said exhibits are stricken from the record because each is merely a copy of another exhibit which has been received into evidence. Exhibit "CP 5" is stricken because it contains hearsay evidence.

Exhibits "CP 29" and "CP 30" were received into evidence without objection.

The following are the auditing judge's findings of fact:

(1) On September 15, 1949, Huber paid the sum of $5,000 to Bickham for and in consideration of her execution of the bill of sale which has been received into evidence as Exhibit "CP 29."

(2) By the terms of Exhibit "CP 29," Huber became entitled to receive $35,000 of all the right, title and interest which Bickham might have in and to the estate of Ralph Bertolet Heilig, and in and to

the trusts created by said decedent's will, under and by virtue of said will or otherwise in any manner whatsoever, subject only to the life estate held by Stubbs, from and after September 14, 1949.

(3) In making the purchase evidenced by Exhibit "CP 29," Huber relied upon the advice of his attorney which appears in Exhibit "CP 3" which recites, in part:

"I have obtained a copy of the will of the above decedent [Ralph B. Heilig] which is satisfactory, and names the above applicant [Bickham] as residuary legatee as to one-fourth of the estate, subject to a life estate in a lady who was born July 26, 1888 [Stubbs]. However, the other three-fourths of the residuary estate was left to charity, [the charities] and the decedent died within thirty days of the date of the will, so that the applicant [Bickham] becomes actually entitled to the entire residue upon the life tenant's death.

"The date of death was April 1, 1948, and the executor's account was audited and confirmed last spring, as a result of which the residuary trust has been established in the amount of approximately $80,000, all of which is invested in sound legal securities, there being no non-legal investment power in the will."

(4) On September 15, 1949, Huber executed and delivered to the accountant Exhibit "CP 17" whereby he reassigned the interest which he had just purchased from Bickham to the Market Street National Bank, as collateral security for his indebtedness to said bank.

(5) The accountant made due note of the assignments evidenced by Exhibits "CP 29" and "CP 17" on the dockets of its trust department.

(6) By Exhibit "CP 20," Provident National Bank, successor by merger to the Market Street National Bank, released the reassignment evidenced by Exhibit "CP 17."

(7) It has been agreed that Stubbs, the life tenant, was born on either July 26, 1888, or July 26, 1889.

(8) In making the sale evidenced by Exhibit "CP 29," Bickham was sui juris.

(9) In the summer of 1960, Huber was approached by Zelman A. Fairoth, Esq., who represented Bickham. Bickham, acting through her attorney, offered to sell an additional $15,000 of her interest in the Heilig Estate to Huber for the sum of $5,000. Huber countered with an offer to buy an additional $18,000 for the sum of $5,000.

(10) On September 14, 1960, Huber, acting through his attorney, George B. Clothier, Esq., paid $5,000 to Bickham for and in consideration of her execution of the bill of sale which has been received into evidence as Exhibit "CP 30."

(11) By the terms of Exhibit "CP 30," Huber became entitled to receive an additional $18,000 of all the right, title and interest which Bickham might have in and to the estate of Ralph Bertolet Heilig, and in and to the trusts created by said decedent's will, under and by virtue of said will or otherwise in any manner whatsoever, subject only to the life estate held by Stubbs.

(12) The trust was then, on or about September 14, 1960, valued at approximately $91,000.

(13) On September 21, 1960, Huber executed Exhibit "CP 19" whereby he reassigned the interest which he had just purchased from Bickham to Central Penn National Bank of Philadelphia, as collateral security for his indebtedness to said Bank.

(14) Huber died on November 22, 1970, leaving a will which was probated by the Register of Wills of Montgomery County, who, on November 27, 1970, granted letters testamentary to Central Penn National Bank, Executor.

(15) On January 21, 1971, Central Penn National Bank assigned the interest in the Heilig estate evidenced by Exhibit "CP 19" to the Estate of Joel Cook Huber, deceased.

(16) Huber's interest in the Heilig estate was included in the inventory of Huber's estate and in the account which Central Penn National Bank filed in its capacity as Executor of the Estate of Joel Cook Huber, deceased. The said interest in the Heilig estate was carried in both the said inventory and account at a value of $45,065.90.

(17) Huber's interest in the Heilig estate was included in the Federal estate tax return and the Pennsylvania inheritance tax return filed by the Estate of Joel Cook Huber, deceased.

(18) By virtue of the inclusion of this interest in the Heilig estate as an asset of the Huber estate in the latter estate's Federal estate tax return, the Estate of Joel Cook Huber, deceased, paid an additional Federal estate tax of $7,836.37, prior to the decision in Cavill.

(19) By virtue of the inclusion of this interest in the Heilig estate as an asset of the Huber estate in the latter estate's Pennsylvania inheritance tax return, the Estate of Joel Cook Huber, deceased, paid an additional Pennsylvania inheritance tax of $2,458.20, prior to the decision in Cavill.

There is no question that the mortmain statute (Section 7(1) of the Wills Act of 1947) and the Pennsylvania Law of Intestate Succession (20 P.S. §1.3) did operate to indefeasibly vest the entire remain-

der interest of the Estate of Ralph Bertolet Heilig, deceased, in his said niece, Bickham, at the time of his death. The interest in the remainder given to the charities being invalid and Bickham being the testator's sole known intestate heir, the question of whether Bickham had to survive Stubbs' death and be found within one year thereafter was rendered moot by operation of law.

Furthermore, there can be no question that Exhibits "CP 29" and "CP 30" represent valid and binding contracts of assignment which Bickham and Huber consummated in express good faith reliance upon the validity of the mortmain statute. In this connection, the court notes the statement at page 8 of the charities' initial brief: "I. The Charities do not attack the contract between Bickham and Huber. They agree with the note on page 29 of Claimant's (Huber's) Brief that they have no standing to question the contract."

Therefore, unless the holding in Cavill, supra, is applied retroactively, Huber, as Bickham's true and lawful assignee, may claim the sum of $53,000 out of the principal of this trust. However, there being no evidence in the record to support the alleged assignment by Bickham to the Commissioner of Welfare of the City of New York, the claim of his successor, Blanche Bernstein, Commissioner of Social Services, New York City, must be denied.

This court has no difficulty in concluding, as a matter of law, that the ruling in Cavill established a new principle of law by deciding an issue of first impression whose resolution was not clearly foreshadowed, thereby qualifying under the first test of Chevron, supra, for nonretroactive application. In so holding, this court joins with both the

majority and dissent in Cavill, as well as the charities, in the common view that, prior to Cavill, the so-called mortmain statute was the undoubted law of this Commonwealth. In giving the opinion of the court in Cavill, Mr. Justice Roberts quotes from Rhymer's Appeal, 93 Pa. 142, 146 (1880): "'While the propriety of legislation which thus limits the right of giving for religious or charitable purposes may sometimes have been questioned, it has *never been doubted* that the act is constitutional . . .'" (Emphasis supplied.) Cavill, supra, at 414, n. 6. However, he goes on to pass off the aforesaid quote from Rhymer as dictum and to make the unequivocal statement that: "Although statutory provisions substantially identical to section 7(1) have been in effect in Pennsylvania since 1855, this Court has never passed on the constitutionality of this so-called 'Mortmain statute.'" Cavill, supra, at 414.

In his dissenting opinion in Cavill, Mr. Justice Pomeroy opens by saying: "The Court today strikes down . . ., a provision which for well over a century has been part of the fabric of our law governing wills and decedents' estates." Cavill, supra, at 417.

The majority in Cavill struck the mortmain statute down because it denied the charitable beneficiaries therein equal protection of the laws. Specifically, the opinion of the court found the statute's 30-day survival requirement to be so "over-inclusive" and so "under-inclusive" as to lack "'a fair and substantial relation' to the legislative object." Cavill, supra, 417. Chevron, supra, now requires this court to determine whether a retroactive application of the holding in Cavill to the facts in the case at bar will be in accord with the Equal

Protection Clause of the Fourteenth Amendment to the Federal Constitution, United States Constitution Amendment XIV, §1, and the provisions regarding special laws in the Pennsylvania Constitution, Pennsylvania Const. Art. III, §32. This court is of the opinion that an application of the holding in Cavill so as to deprive Huber of the benefit of his contracts of assignment, without a simultaneous opening or setting aside of every Orphans' Court award made to an assignee such as Huber, before the decision in Cavill would effectively create an arbitrary and unreasonable distinction such as would violate the principle of law enunciated in Cavill. That is, short of a wholesale vacating of all such awards made prior to Cavill, an application of Cavill to Huber would be just as arbitrary as the thirty-day survival requirement which the majority in Cavill found offensive to the principles of equal protection, in that, those assignees whose interests vested in possession (by award of the Orphans' Court) prior to Cavill would be protected (thus perpetuating the denial of equal protection to the charities in those cases) while assignees such as Huber, who have not "collected" prior to Cavill, will be denied the benefits of their contracts of assignment. Such a result would retard the operation of the principle laid down in Cavill. The second test for nonretroactive application thus seems to have been met.

The manifest inequity which would be imposed by a retroactive application of Cavill so as to defeat Huber's interests in the case at bar satisfies the final test for nonretroactivity enunciated in Chevron. The charities are not the only innocent "victims" of the mortmain statute in this case. As this court has found Huber paid $5,000, on two separate

occasions, in good faith reliance upon the undoubted laws of this Commonwealth which operated to indefeasibly vest the entire remainder interest in this trust in his assignor. Having done so, Huber is no more and no less than a bona fide purchaser for value without notice of any defect in the title of his assignor. Furthermore, Huber's estate has paid substantial death taxes to both the Federal Government and the Commonwealth in good faith reliance upon the validity of the mortmain statute. Fundamental principles of equity require this court to protect Huber's interests as against the charities who have not changed their positions at all since the death of the testator.

The claim of the Estate of Joel Cook Huber, deceased, is allowed in the sum of $53,000 and the awards will be made accordingly.

It does not necessarily follow from the foregoing discussion that the Estate of Ruth E. Heilig Bickham Fortugno, deceased, has an interest in this trust. Aside from the assignments to Huber, and the alleged assignment to the Commissioner of Welfare of the City of New York, there is no evidence in this record of reliance by Bickham upon the validity of the mortmain statute. While there is no set principle of absolute retroactive invalidity of statutes declared unconstitutional, the interests of Bickham as a remainderman under the will of Ralph Bertolet Heilig and as his sole intestate heir do not meet the second and third tests of nonretroactivity laid down in Chevron. The mortmain statute (section 7(1) of the Wills Act of 1947) did deprive the charities of equal protection of the laws in this case, and, retroactive application of the ruling in Cavill to protect the interest of the charities will further the principle established therein. No inequity would be

imposed upon Bickham's estate by a retroactive application of Cavill to benefit the charities herein. The awards will be made accordingly.

There was no objection to the account, which shows a balance of principal of $92,705.40 which, composed as indicated, less an additional credit of $9,701.20 which is stated in the notices of audit to be payment of Pennsylvania transfer inheritance tax on the remainder interests, is awarded as follows: $53,000 to the Estate of Joel Cook Huber, deceased, and the balance, in equal shares, to: Inglis House-Philadelphia Home for Incurables, in memory of the decedent's wife, Anna E. Heilig; Mennonite Home, in memory of decedent's mother, Deborah Bertolet Heilig; and Shriners Hospital for Crippled Children, in memory of decedent's father, George E. Heilig.

• • •

## ORDER

And now, January 30, 1979, the account is confirmed nisi.