**LIBERTY NATIONAL BANK AND TRUST COMPANY, Executor of the Will of Louis E. Troutman, Deceased,**

and

**Rinda Gaye McQuaide**

and

**Troutman Insurance Incorporated, Plaintiffs–Appellants, Cross–Appellees,**

v.

**The LIFE INSURANCE COMPANY OF CINCINNATI, Defendant–Appellee, Cross–Appellant.**

Nos. 88–6129, 88–6154.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 29, 1989.

Decided April 26, 1990.

Gerald R. Toner (Argued), Stephen A. Watkins, Ogden, Sturgill & Welch, Louis-

ville, Ky., for plaintiffs-appellants, cross-appellees.

Winfrey P. Blackburn, Michael D. Risley (Argued), Stites & Harbison, Louisville, Ky., for defendant-appellee cross-appellant.

Before KENNEDY and NELSON, Circuit Judges, and WISEMAN, Chief District Judge.[*]

DAVID A. NELSON, Circuit Judge.

This is an action for the recovery of $875,000 in death benefits under two insurance policies. The insured had obtained a $1 million replacement policy some months before his death and had stopped the payment of premiums on the original policies. He did so, according to the plaintiffs, in reliance on erroneous information given him by the defendant insurance company with regard to the cash surrender value of one of the original policies.

The insurance company admitted having given the erroneous information, but denied that the insured had relied on it. On cross-motions for summary judgment, the district court held that the fact of reliance was established beyond dispute. Because the insured had purchased new coverage in the expectation that he would receive approximately $21,000 on surrendering the old policies, the court held, the company was obligated to pay what the insured had expected to receive; the company was not obligated to pay the face amount of the old policies, one of which had been surrendered for a cash value of approximately $5,000 and the other of which had lapsed because of nonpayment of premiums.

The plaintiffs have appealed, contending that under Kentucky law (which the parties agree is applicable in this diversity case) the court erred in not ordering reinstatement of the policy on which the erroneous cash value information had been furnished. The defendant has cross-appealed, contending that there was no evidence of reliance and that the company therefore owed the plaintiffs nothing.

If there was reliance on the erroneous information, we see no error in the scope of the relief ordered by the district court. It seems to us, however, that there was a genuine issue as to the fact of reliance; the evidence, as we read it, is equivocal as to whether the policy in question would or would not have been replaced in the absence of any misinformation. The entry of summary judgment having been inappropriate, we shall vacate the judgment and remand the case to the district court.

I

Louis Troutman, the insured, was the owner of an insurance agency in Louisville, Kentucky. The Troutman agency sold a number of different lines of insurance, including homeowners, automobile, marine, business, health, and life insurance. There is a conflict in the deposition testimony as to how high a volume of life insurance Mr. Troutman sold, and thus how great a familiarity with life insurance he could be supposed to have—but it is undisputed that, as various witnesses testified, Mr. Troutman was a "smart," "astute," and "hard working" insurance agent, who was "very knowledgeable about what he was doing."

The Troutman agency represented at least two insurance companies affiliated with Cincinnati Financial Corporation. One, the defendant in this case, was The Life Insurance Company of Cincinnati, or "Life of Cincinnati."

In August of 1981 Mr. Troutman applied to Life of Cincinnati for two policies of insurance on his own life: a $275,000 "whole life" policy, and a $600,000 "increasing premium whole life" policy. The distinguishing features of the "increasing premium" product, the evidence shows, included "a very, very low incoming premium," which premium would increase each year for the first 20 years. During most of that period the policy would have no cash value. For a man of Mr. Troutman's age (which was 44 in 1981), the policy would not start to build up a cash value until the sixteenth year. The cash value would in-

---

[*] The Honorable Thomas A. Wiseman, Jr., Chief Judge of the United States District Court for the Middle District of Tennessee, sitting by designation.

crease each year thereafter, and the maximum premium chargeable by the company could not increase after the twentieth year.

The two policies, listing the Troutman agency as beneficiary, were issued by Life of Cincinnati in September of 1981. The smaller policy, which contained a table showing that it would start to build up a cash value in the third year, had a monthly premium of $356.82 for the first three years. The larger policy, page four of which contained a table showing that there would be no cash value until the end of the fifteenth year, had a much smaller initial premium. By the fourth year, when Mr. Troutman undertook to surrender both policies, the combined monthly premium came to $490.67; the larger part ($363.59) was for the smaller policy. The reason the smaller policy cost almost three times as much as the larger one was that the larger policy was not designed to have any cash value until many years in the future.

Life of Cincinnati had a sister company, the Cincinnati Insurance Company, for which the Troutman agency sold casualty insurance for a time. Cincinnati Insurance cancelled its relationship with the Troutman agency for some reason. The deposition testimony of Mrs. Sharon Robinson, the Troutman agency's bookkeeper and a key witness in this case, suggests that the cancellation occurred about a year before Mr. Troutman started looking for coverage with which to replace his Life of Cincinnati policies.

There may or may not have been a connection between Cincinnati Insurance's cancellation of the Troutman agency and Mr. Troutman's interest in replacing the Life of Cincinnati policies. Richard Lonneman, the marketing vice president of Life of Cincinnati, testified that Mr. Troutman told him he was going to try to replace as much Life of Cincinnati business as he could with insurance written by another company. "He felt that since Cincinnati [Insurance] didn't want him, eventually [Life of Cincin-

nati] would not want him, so he would get rid of the business."

Mrs. Robinson, the bookkeeper, testified that as far as she knew the termination by Cincinnati Insurance had no effect on the agency's relationship with Life of Cincinnati. She also testified, however, that to her knowledge the Troutman agency wrote no life insurance policies for Life of Cincinnati after June of 1984.

Mrs. Robinson testified that Mr. Troutman had sold "increasing premium" policies, comparable to his own $600,000 policy, to clients named Bill Brummett and Leon Shaw;[1] that in September or October of 1984 the Troutman agency was "looking for better types of coverage of policies for Bill Brummett, Leon Shaw, several other insureds;" that Mr. Troutman had asked her to get several quotes for each of these clients on a type of policy called "universal life;" and that after giving her the names of other people to get quotes on universal life for, "he said while you are at it, get one [i.e. a quote] for me for a million dollars...." This was the first Mrs. Robinson knew of Mr. Troutman's wanting to replace his own Life of Cincinnati policies.

Mrs. Robinson obtained quotations from three companies: Commercial Union, Life of Cincinnati, and Executive Life. "Premium-wise and face value-wise," Mrs. Robinson testified, the policies offered by the other companies were better than those offered by Life of Cincinnati. Mrs. Robinson reported the results of her inquiries to Mr. Troutman, and she testified that he then worked with the people involved to "roll over" their existing Life of Cincinnati policies into policies written by other companies.

After a week or so, Mrs. Robinson went on to say, Mr. Troutman asked her to call Life of Cincinnati and see what the cash value was on his own insurance—to "see if he wanted to roll it over or not." The policies themselves were kept in a file drawer in her office, Mrs. Robinson testified, but neither she nor Mr. Troutman got

---

1. Donald Adick, Director of Policyholder Services for Cincinnati Financial's life insurance companies, testified that he understood Mr. Trout-

man sold a total of perhaps ten or twelve increasing premium policies.

out either policy to look at it. (Later in her deposition, Mrs. Robinson said that they had tried to look at the policies, but neither policy was in the file.) Getting the policy numbers from a bank withdrawal slip on which the numbers were listed in connection with an automatic premium payment plan, Mrs. Robinson telephoned Life of Cincinnati with both policy numbers and asked for the cash value.

She was given a cash value for each policy. When she reported the figures to Mr. Troutman, he asked her to check again because he thought that "one of the policies would have a zero cash value."[2] Mrs. Robinson called the insurance company back and was given the same figures a second time. Still not believing that the figures were right, Mr. Troutman had Mrs. Robinson write the company a letter asking for the cash values.

This letter, dated October 9, 1984, read as follows:

"Please send the cash value and the amount of insurance on Mr. Troutman's policies # L0023176 and Loo23177. Alos [sic] will you send us some lost policy release forms."

The letter was received by Virginia McCowen, an employee in Life of Cincinnati's policyholder service area. Ms. McCowen pulled the policies up on the screen of her computer and jotted down what she took to be the face amount and cash value of each policy. For the $275,000 policy, she recorded a cash value of $3,940.75. For the $600,000 policy, she recorded a cash value of $17,184.00.

The latter figure—which was far in excess of the total premiums that had been paid on the policy—was, of course, a mistake. Ms. McCowen subsequently testified that the screen showed a zero cash value, along with a figure (displayed for actuarial purposes) that had a minus sign in front of it. Ms. McCowen evidently missed the minus sign and mistakenly took the figure

she saw on the screen—$17,184.00—as a positive cash value.

Under date of October 15, 1984, Ms. McCowen sent Mr. Troutman a letter referencing both policy numbers and listing the cash value of the $275,000 policy as $3,940.75 and the cash value of the $600,000 policy as $17,184.00. When the letter was received by Mr. Troutman, Mrs. Robinson testified, he said he must have been mistaken about the cash value; "they must be right," she quoted him as saying, "because they should know."

Mr. Troutman did not attempt to cash in either policy right away. But on November 5, 1984—contemplating a replacement of the Life of Cincinnati policies with a Commercial Union universal life policy that provided "a larger face value for approximately the same premium," as Mrs. Robinson testified—Mr. Troutman, acting as agent for Commercial Union, executed two statutory "Notice[s] Regarding Replacement of Life Insurance." The notices, which he also signed as an applicant for a Commercial Union policy, warned the customer that changing an existing policy "could be a good decision or a bad decision." The notices went on to urge the customer to "[c]ompare your existing policy and the proposed policy before you make a final decision." Also, the notice forms suggested, "[i]f you change insurance policies, continue your present insurance until a new policy is delivered and accepted by you."

In consonance with the latter suggestion, Mr. Troutman allowed the Life of Cincinnati premiums to continue being deducted from the Troutman agency's bank account for a time. In due course, Commercial Union issued the million dollar universal life policy on which Mrs. Robinson had obtained a quote. The Commercial Union policy was still in effect at the time of Mr. Troutman's death.

---

**2.** There is a sharp conflict on this point between Mrs. Robinson's deposition testimony and an affidavit she signed seven months later. The affidavit said that while Mr. Troutman questioned the cash value quoted by Life of Cincinnati, "he did not question that there *was* a cash value." In her live deposition testimony, Mrs. Robinson said just the opposite: "He said he didn't believe the one policy should have a cash value."

After the Commercial Union policy had been issued, Mr. Troutman terminated the arrangement for automatic payment of the Life of Cincinnati premiums. The premiums were paid through January of 1985, but not thereafter.

When Life of Cincinnati sent the bank a check for automatic payment of the premiums due January 30, 1985, the bank returned the check with the notation "Payment Stopped." The insurance company sent Mr. Troutman a form letter advising him of this fact and asking him to remit $490.67 on or before March 1, 1985. (The $600,000 policy had a grace period of 31 days after the due date, and it provided that "[i]f a premium is not paid by the end of its grace period, this policy will terminate...." Because February had only 28 days, the policy was not actually scheduled to terminate until two days after the date specified in the letter.)

No premiums were remitted. Instead, at Mr. Troutman's direction, Mrs. Robinson sent Life of Cincinnati a letter, dated February 15, 1985, asking that a check for the cash value be sent to Mr. Troutman. Enclosed with the letter were two documents: a "lost policy release" form for the $275,000 policy (which had still not been located), and the original $600,000 policy.

At her deposition, Mrs. Robinson testified that she recalled going to her file to look for the policies and she recalled finding one but not the other. "I think we realized that the one policy was missing earlier," she said, "and that is the reason we requested the lost policy release." In her subsequent affidavit, Mrs. Robinson said "I have no recollection of seeing the policy in October of 1984." It is undisputed, in any event, that the $600,000 policy was in Mrs. Robinson's physical possession on February 15, 1985, more than two weeks before the expiration date. It is also undisputed that the Table of Values set forth at page four of the policy showed a cash value of ".00" for each of the first 15 policy years.

Whether Mr. Troutman actually looked at the policy before it was returned to the insurance company we do not know. Mrs. Robinson testified that she did not recall his looking at the policy at or before the time he received the October 15 letter, but she failed to say whether he did or did not look at the policy before it was returned to the insurance company the following February.

Under date of February 28, 1985, in response to the request for a check representing the cash value, Life of Cincinnati sent Mr. Troutman a form letter referencing only the $275,000 policy, stating that "[y]our policy has been surrendered as you requested," and enclosing a check for $5,040.75. (The cash value of the smaller policy had increased to that amount since October.)

When Mr. Troutman received the February 28 letter, Mrs. Robinson testified, "that was the first time we knew that the other policy ... definitely did not have any cash value." Mr. Troutman told her to call Cincinnati and find out what the problem was. She did so, and was told that the other policy had no cash value. It is not clear whether the grace period had expired by this time, but Mr. Troutman made no attempt to tender the late premium in any event; he simply asked Mrs. Robinson to get Life of Cincinnati Vice President Dick Lonneman on the phone for him. Mr. Lonneman was out of his office that day, but returned the call later. Mr. Troutman explained what he had been given to understand about the cash value, according to Mrs. Robinson, and he told Lonneman that he wanted "either the cash value or the policy reinstated."

Prior to the conversation with Mr. Lonneman, Mr. Troutman had learned that he had pancreatic cancer. (Mrs. Robinson thought he found out in February, but Mr. Troutman's widow testified that the diagnosis was made on March 2, 1985.) Mr. Troutman told Mr. Lonneman of the diagnosis, and Lonneman responded that "that could be a problem" as far as reinstatement was concerned. After conferring with Director of Policyholder Services Don-

ald Adick,[3] Lonneman told Troutman that the policy would not be reinstated and that, in Lonneman's words, "We could take no action other than that allowed by contract. A clerical error occurred and the policy language still holds."

On April 30, 1985, Mr. Troutman sent a letter to the Kentucky Department of Insurance asking for the department's help in resolving the dispute with Life of Cincinnati. The letter, which was prepared for Mr. Troutman's signature by Mrs. Robinson, explained that Life of Cincinnati had been asked for "the exact amount of cash value, as I was considering changing the policy [sic] to a Universal Life policy." Life of Cincinnati had reconfirmed cash values totalling $21,124.75, the letter continued, and this information was of "critical" importance:

"The amount of the cash value was critical because without the $21,124.75 I could not afford a new policy. Using the $21,124.75 we determined the cash value roll over was sufficient to continue to pay the same $600,000 annual premium to Commercial Life Insurance. This new policy would be for $1,000,000.

\* \* \* \* \* \*

The last part of this is that I would not have considered cashing in the Life of Cincinnati policies if I had known they had in fact had such a low cash value. I would have held the policies longer to enable the policy value to grow and make my decision then to cancel or not."

By letter of July 1, 1985, the Kentucky Department of Insurance told Life of Cincinnati that Mr. Troutman should be allowed to reinstate his Life of Cincinnati policies without regard to insurability. Mr. Troutman died three weeks later. Commercial Union subsequently paid a death benefit of $1 million under the replacement policy, but Life of Cincinnati declined to reinstate either of the policies that had

been replaced and declined to make any further cash value payment.

A letter that Life of Cincinnati's Mr. Adick sent the Kentucky Department of Insurance in August of 1985 contains hearsay information casting doubt on the proposition that the Life of Cincinnati policies would not have been replaced but for Mr. Troutman's understanding that surrender of the policies would produce some $21,000 for a "roll over" investment with Commercial Union. ("Rolling over" a lump sum into the universal life policy written by Commercial Union would evidently have reduced the minimum monthly payments necessary to keep the Commercial Union policy in force.) Commercial Union, according to Mr. Adick, reported that nothing was in fact rolled over, not even the $5,040.75 that Life of Cincinnati paid on February 28, 1985—and without any rollover at all, according to Mr. Adick's understanding of the Commercial Union report, the monthly premium for the Commercial Union policy was still only $500. This, of course, was virtually the same as the combined premiums Troutman had been paying Life of Cincinnati. Without having used *any* cash value payment from Life of Cincinnati, if Mr. Adick's information was correct, Mr. Troutman obtained a $125,000 increase in coverage with almost no increase in premiums.

Based on the additional information received from Commercial Union, Mr. Adick's letter to the Department of Insurance concluded, "I am sure you will agree reinstatement is not appropriate." There is no indication that the department pursued the matter any further. In March of 1987, however, Mr. Troutman's widow and the executor of his estate (which had succeeded to Mr. Troutman's interest in the Troutman agency) brought an action against Life of Cincinnati in the Circuit Court of Jefferson County, Kentucky, seeking judgment for death benefits of $875,000, plus interest

---

**3.** Mr. Adick's deposition indicates that this conference occurred on April 10, 1985. A memorandum Mr. Adick prepared on that date reports that Mr. Lonneman had explained Lou Troutman's position as follows: "Lou said that as a result of our misquoting the cash value ... he was under the impression that he could afford a new $1,000,000 policy with another company. He apparently applied for it, surrendered his policies with us, and now that he knows the real cash value, cannot afford the coverage."

and less any additional premiums due. The case was removed to federal court on diversity grounds.

On cross-motions for summary judgment, the district court entered judgment for the plaintiffs in the amount of $17,-184.00, with prejudgment interest from the date on which the cash value request had been received by Life of Cincinnati. The case comes before us on appeals by both parties. The plaintiffs have abandoned their claim for death benefits on the smaller policy, but they contend that the district court erred in not reinstating the larger policy and in not awarding them a $600,000 death benefit under it. The defendant contends that the court erred in awarding the plaintiffs anything.

## II

■ If Mr. Troutman did not act in reliance on the erroneous cash value information when he replaced the Life of Cincinnati policies with the Commercial Union policy, the plaintiffs can have no valid claim for relief of any kind. See *Lincoln–Income Life Ins. Co. v. Kraus*, 279 Ky. 842, 846, 132 S.W.2d 318, 321 (1939) (reliance essential for rescission of contract on basis of misrepresentation). The plaintiffs, of course, have the burden of proof on the issue of reliance. See *Lincoln–Income Life*, 279 Ky. at 845–48, 132 S.W.2d at 320–22.

The defendant insurance company argues that Mr. Troutman had already decided to replace the Life of Cincinnati policies before he received the erroneous cash value information. Given the record before the district court, however, there is no way the court could have resolved that factual question in the insurance company's favor on a motion for summary judgment. Mr. Troutman may have wanted to switch all the business he could away from Life of Cincinnati, but nothing in the record establishes that he had made an irrevocable decision to switch his own coverage to another company even if it would have been financially disadvantageous for him to do so. All he appears to have done before being told that his cash values totaled more than

$21,000 was to ask for quotations—from Life of Cincinnati itself, among others—on a million dollar universal policy. This hardly demonstrates a commitment to switch his personal coverage away from Life of Cincinnati regardless of cost.

Whether the plaintiffs are entitled to summary judgment on the question of reliance is a more difficult case. Although Mr. Troutman did not think, at first, that his $600,000 policy had any cash value, Life of Cincinnati stated, both orally and in writing, that it did. As long as Mr. Troutman did not have access to the policy, he was doubtless entitled to believe what the insurance company told him.

It is clear, however, that whatever lulling effect of the insurance company's erroneous information may have had, Mr. Troutman did at least have access to the policy before he allowed its coverage to lapse. He could not have had Mrs. Robinson send the policy back to the company, as she did on February 15, 1985, if the policy had not been located by then. The policy itself showed unambiguously that there would be no cash value until the coverage had been in force for fifteen years—and as an astute and experienced insurance agent, Mr. Troutman might well have wondered how the policy could possibly have had a large cash value in the fourth year, when the total of the premiums he had paid was so much less than the supposed cash value and so much less than the premiums on the smaller policy. (If Mr. Troutman had not entertained doubts on this score earlier, of course, he would not have told Mrs. Robinson he did not think there was any cash value, and he would not have had her double check this point with the company.)

Because another aspect of the reliance issue necessitates a remand in any event, we shall not attempt to decide at this juncture whether, under Kentucky law, Mr. Troutman was entitled to let the policy lapse in reliance on the insurance company's very surprising statements, notwithstanding that the policy had been located well before it lapsed and notwithstanding that Mr. Troutman was thus in a position to determine for himself what the policy

actually said. The district court does not seem to have focused on this issue. We invite it to do so, along with considering any testimony that Mrs. Robinson may have to offer on whether Mr. Troutman did or did not look at the policy before returning it to the company.

A factual question of no less concern to us is one on which Mrs. Robinson ought to be able to shed considerable light after consulting the Troutman agency's records. That is the question of the Commercial Union policy's actual cost—what the premiums would have been with a $21,000 cash investment, what the premiums were without such an investment, and what cash values would have been built up under both scenarios. In the absence of this information, it is hard to assess the likelihood that Mr. Troutman would still have thought it financially advantageous to switch to Commercial Union if he had known that the $600,000 Life of Cincinnati policy would not have any cash value until another 11 or 12 years had passed.

The record is far less informative than it ought to be on what the Commercial Union policy actually cost. There is hearsay evidence (the admissibility of which has not been briefed) suggesting that even without any lump sum investment up front, the cost of the million dollar Commercial Union policy was not significantly greater than the cost of the $875,000 Life of Cincinnati coverage. Mr. Troutman, on the other hand, claimed that he "could not afford a new policy" without the $21,000 from Life of Cincinnati. His claim was not substantiated by any cost data whatever. Mr. Troutman said he would not have "considered" cashing in the Life of Cincinnati policies if he had known that they had such a low value, but we know that before he was given any cash value figures he considered doing precisely that. We have no idea whether, from a financial standpoint, it would have made more sense for Mr. Troutman to buy a universal life policy without rolling anything over into it, or to keep the Life of Cincinnati policy until it started building up a cash value eleven or twelve years down the road. The plaintiffs surely have access to reliable information

on this, and the district court will be in a better position to decide what to believe after the specifics on the cost of the Commercial Union policy have been put in evidence.

The district court will also be in a better position to evaluate Mrs. Robinson's evidence after she has taken the stand in person. In her affidavit, where she was not subject to cross-examination, Mrs. Robinson opined that "Mr. Troutman would not have cancelled his Cincinnati Life Insurance Policy # L0023177 had he been given accurate information that it had no present cash value. To have cancelled the policy with no cash value would have been to waste premiums amounting to almost $7,000.00." The basis for these opinions is far from self-evident. Most people do not think they "waste" the premiums they spend on term insurance, and if Commercial Union was offering a better deal even without a lump sum investment—which may or may not have been the case—we fail to see why Mr. Troutman would not have cancelled the Life of Cincinnati policy regardless of whether Life of Cincinnati confirmed his original understanding as to the cash value of the $600,000 policy.

It is evident, both from the widow's testimony and from Mrs. Robinson's, that Mr. Troutman never intended to keep all three policies in force, thereby maintaining coverage totalling $1,875,000.00. What is not evident, on this record, is why Mr. Troutman, given accurate information, would have considered it more advantageous to retain the Life of Cincinnati policies than to replace them. The record now before us presents important and genuine issues of material fact, and summary judgment is simply not appropriate in such a situation. The mere fact that both sides moved for summary judgment, each contending that there was no genuine issue as to any material fact, does not, of course, require the court to rule that the parties were correct on the nonexistence of fact issues. *Begnaud v. White*, 170 F.2d 323, 327 (6th Cir. 1948).

## III

■ If it is established hereafter that Mr. Troutman did rely on the erroneous information as to cash value, the district court will again have to address the question of a remedy. That issue has been fully briefed and argued, and we think it appropriate to say that we find no error in the district court's announced view on the subject.

The district court put it this way:

"Essentially, defendant offered to buy Mr. Troutman's policy for $17,184.00. Mr. Troutman freely elected to accept that offer, and he signified his acceptance in precisely the manner prescribed, forwarding the policy to defendant and requesting payment. Under such circumstances, all that remains is for this Court to enforce the contract by directing defendant to pay the offered amount."

■ Because, by hypothesis, both parties were acting under the same mistaken belief as to the terms of the original policy, it seems clear that in granting relief the court would be sitting as a court of equity and not as a court of law. A remedy based on mutual mistake is equitable, not legal. *Bradshaw v. Kinnaird,* 319 S.W.2d 475, 477 (Ky.1958). In selecting an appropriate equitable remedy, the trial court has "broad discretionary power; appellate review is correspondingly narrow." *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). And "[a] court of equity has no right to make or alter a contract to suit either party, but it will always relieve against a mistake by granting such relief as the ends of justice demand." *Eastland v. Robinson,* 233 Ky. 403, 407, 25 S.W.2d 1028, 1029 (1930).

What the plaintiffs seek here is a decree ordering rescission of the contract of surrender and reinstatement of the original contract of insurance, subject to payment of the omitted premiums. But such a decree would give the beneficiary substantially more than Mr. Troutman thought he was bargaining for. It would go well beyond what "the ends of justice demand." And nothing in *Lovell v. St. Louis Mutual Life Ins. Co.,* 111 U.S. 264, 4 S.Ct. 390, 28 L.Ed. 423 (1884), on which the plaintiffs rely, suggests that a surrendered policy must be revived on grounds of mistake even if, as is true here, the insurer can be required to comply exactly with the terms on which the insured intended to surrender the policy.

As long as the supposed cash value was paid, Mr. Troutman had no intention of keeping the $600,000 Life of Cincinnati policy in force. The most he could have expected to receive on the policy, after sending it in for surrender, was $17,184.00. Even after he realized he had cancer, indeed, he told the company that he wanted *"either* the [erroneously stated] cash value *or* the policy reinstated."* (Emphasis supplied.) There could be no abuse of judicial discretion in ordering the insurance company to grant Mr. Troutman's first alternative.

## IV

The plaintiffs argue, finally, that K.R.S. § 304.15–310 makes it mandatory that all whole life policies sold in Kentucky have a prescribed miimum cash surrender value after three years. They argue further that Life of Cincinnati's failure to pay the statutory cash surrender value on demand meant that the policy continued in force after the expiration of the grace period notwithstanding the fact that no premiums were being paid.

The plaintiffs, in our view, have not shown that the terms of the Life of Cincinnati policy violated the statute. They will have an opportunity to attempt such a showing on remand, and it will be time enough to consider the consequences of a breach of the statute when and if the plaintiffs succeed in proving that a breach occurred.

With various exceptions, none of which seems applicable here, K.R.S. § 304.15–310 provides that

"(1) No policy of life insurance ... shall be delivered or issued for delivery in this state unless it shall contain, in substance[,] the following provisions, *or corresponding provisions which in the*

*opinion of the commissioner [of insurance] are at least as favorable to the defaulted or surrendering policy holder as are the minimum requirements hereinafter specified....*

\*    \*    \*    \*    \*    \*

(b) Cash surrender value. That, upon surrender of the policy within (60) sixty days after the due date of any premium payment in default after premiums have been paid for at least three (3) full years in the case of ordinary insurance ... the insurer will pay, in lieu of any paid-up non-forfeiture benefit, a cash surrender value of such amount as may be hereinafter specified." (Emphasis supplied.)

K.R.S. § 304.14–120(1) provides, in its first sentence, that "No basic insurance policy ... shall be delivered, or issued for delivery in this state, unless the form has been filed with and approved by the commissioner."

If the Kentucky insurance commissioner approved Life of Cincinnati's "increasing premium" insurance policy form, we assume he necessarily found that its provisions "are at least as favorable to the defaulting or surrendering policyholder as are the minimum requirements" specified under K.R.S. § 304.15–310. We assume further that Life of Cincinnati would not have issued a Kentucky policy in a form not previously filed with and approved by the commissioner in accordance with K.R.S. § 304.14–120. The plaintiffs—on whom the burden of proof still rests, of course—will have an opportunity to challenge these assumptions on remand.

The judgment of the district court is VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.